TOWN OF MONTEZUMA and Montezuma Municipal Gas Utility, Appellants/Cross–Appellees–Defendants,

v.

Kristy S. DOWNS, Individually and as personal representative of the estate of Ivan Dean Downs, and as Guardian of Susan Downs and Matthew Downs, Appellee/Cross–Appellant–Plaintiff.

No. 61A01–9701–CV–13.

Court of Appeals of Indiana.

Sept. 9, 1997.

William H. Kelley, Jennifer A. Bauer, Kelly, Belcher & Brown, Bloomington, for Appellants.

George M. Plews, Jeffrey D. Claflin, Donna C. Marron, Plews Shadley Racher & Braun, Indianapolis, for Appellee.

BAKER, Judge.

In this interlocutory appeal, appellants/cross-appellees Town of Montezuma and Montezuma Municipal Gas Utility (Montezuma) challenge the trial court's grant of partial summary judgment in favor of appellee/cross-appellant Kristy S. Downs individually, as personal representative of the Estate of Ivan Dean Downs, and as guardian of Susan and Matthew Downs. In particular, Montezuma contends that genuine issues of material fact exist which preclude the entry of summary judgment on the issue of its violation of several federal regulations. On cross-appeal, Downs contends that the trial court erroneously denied her motion for summary judgment on the issue of whether Montezuma waived the limitation of liability provisions of Indiana's Tort Claims Act (ITCA).[1]

## FACTS

At approximately 1:30 a.m. on January 21, 1993, a natural gas explosion destroyed the Downs' home, killing Ivan Dean Downs and injuring Kristy, Suzanne and Matthew Downs (hereinafter collectively the Downs). Specifically, the explosion occurred after a natural gas pipeline leading into the Downs' home corroded and leaked gas, which ignited. This pipeline was installed by Montezuma in 1934 and placed into service in 1942. Although the pipeline leading into the Downs' home was made of bare steel, Montezuma had implemented a plan in the early 1990's to systematically replace all of the pipelines within its system with polyethylene pipe, which is less susceptible to corrosion than steel. As part of this plan, Montezuma had replaced the steel gas main on Jefferson Street, in front of the Downs' home, with a polyethylene gas main. During this excava-

---

1. The Downs' cross-appeal was originally filed as an interlocutory appeal under Cause No. 61A01–9611–CV–476. Because the issue concerns the same parties and arises from the same summary judgment order, however, it has been consolidated with Montezuma's appeal by order of the Chief Judge.

tion, although a portion of the Downs' service line was exposed in order that the new pipeline could be run under the Downs' line, the Downs' pipeline was not replaced.

Following the explosion, federal, state and local authorities investigated. Soon thereafter, the National Transportation and Safety Board (NTSB) concluded that the explosion had been caused by corrosion of the bare steel service pipe which connected the Downs' home with the gas main on Jefferson Street. Specifically, the NTSB's report provided as follows:

> [T]he probable cause of the accident was the failure of a corroded bare steel coupling under stress from a growing tree root pressing downward on the curb box and transferring the load to the pipe and coupling. Contributing to the accident was the failure of Montezuma Utilities to have an adequate surveillance program to detect corrosion and external forces such as those created by the tree.

Record at 86.

On March 8, 1994, the Downs filed a complaint against Montezuma, alleging that it negligently operated and maintained its pipeline system.[2] Thereafter, the Downs filed a motion for partial summary judgment, claiming that Montezuma was negligent per se for violating several federal pipeline safety regulations. R. at 44. Additionally, the Downs argued that because Montezuma had purchased insurance in excess of the liability limitations provided in the ITCA, it had waived those liability limits.

On September 20, 1996, the trial court granted the Downs' motion in part and denied it in part. Specifically, the trial court concluded that Montezuma was negligent per se for violating 49 CFR § 192.747 (Valve Maintenance Regulation), which requires yearly maintenance of those valves "which may be necessary for the safe operation of a distribution system," and that this negligence was the proximate cause of the Downs' injury. In addition, the court held that Montezuma had violated 49 CFR § 192.459 (Exposed Pipeline Regulation), which requires pipeline operators to inspect for corrosion any time a buried pipeline is exposed, and 49 CFR §§ 192.613 and 192.614(a) (Surveillance and Excavation Regulations), which require the utility to have procedures for surveillance of corroded lines and for prevention of damage by excavation activities. However, the court determined that genuine issues of material fact existed regarding whether Montezuma's failure to inspect the exposed pipeline and develop surveillance and excavation procedures was the proximate cause of the Downs' damage. Finally, the court determined that Montezuma's purchase of excess liability insurance did not waive the limitation of liability provisions of the ITCA. As a result, the trial court entered judgment in favor of the Downs on the issue of Montezuma's negligence and liability, but denied summary judgment on the issue of the ITCA. Both parties now appeal.

## DISCUSSION AND DECISION [3]

### I. Standard of Review

Summary judgment is appropriate only when no genuine controversy exists. *O'Neal v. Throop*, 596 N.E.2d 984, 986 (Ind.Ct.App. 1992), *trans. denied.* In reviewing the propriety of the grant of summary judgment, this court applies the same standard as the trial court. *Id.* The party seeking summary judgment has the initial burden of demonstrating that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Whiteco Industries, Inc. v. Nickolick*, 571 N.E.2d 1337, 1339 (Ind.Ct.App.1991), *trans. denied.* Once the movant presents pleadings, depositions, answers to interrogatories, admissions or affidavits showing he or she is entitled to summary judgment, the

2. The Downs named numerous other defendants in their complaint, including Utility Safety and Design, Inc., who was hired by Montezuma to inspect and advise regarding the pipeline system, Black Pipeline Construction, who had allegedly damaged the service line to the Downs' home while performing unrelated work several months earlier, Natural Gas Odorizing, Inc., who sold Montezuma the odorant for the gas, Panhandle Eastern Pipeline Company, who supplied the gas to Montezuma, and Vesta Energy, Inc., who sold the gas to Panhandle Eastern Pipeline. None of these other defendants is a party to this appeal.

3. Oral argument was held in this cause on July 9, 1997, in Indianapolis.

non-movant cannot rest on his pleadings, but must set forth specific facts establishing a genuine issue of material fact. *Ogden Estate v. Decatur County Hosp.*, 509 N.E.2d 901, 902 (Ind.Ct.App.1987), *trans. denied.* A failure to establish a disputed issue of material fact will result in the grant of summary judgment provided the movant is entitled to judgment as a matter of law. *Id.*

## II. Federal Regulations

■■■■■ Montezuma challenges the trial court's grant of summary judgment in favor of the Downs on the basis of its alleged violation of several federal regulations. Under Indiana law, an unexcused or unjustified violation of a duty dictated by a statute is negligence per se. *Inland Steel v. Pequignot*, 608 N.E.2d 1378, 1383 (Ind.Ct.App.1993), *trans. denied.* Before determining that the violation of a statute constitutes negligence, however, the court must scrutinize the statute and consider "the purpose of the enactment, the persons whom it was intended to protect and the injuries which it was intended to prevent." *Id., quoting Reuille v. Bowers*, 409 N.E.2d 1144, 1148 (Ind.Ct.App.1980).

■■■■■ In addition to determining whether a defendant violated a duty dictated by statute, the court must also consider whether the breach was the proximate cause of any injury. *Id.* "The violation of a statute raises no liability for injury to another unless the injury was in some manner the result of such violation." *Conway v. Evans*, 549 N.E.2d 1092, 1095 (Ind.Ct.App.1990). In order for an injury to be the proximate result of a statutory violation, the injury must have been a foreseeable consequence of the violation and would not have occurred if the requirements of the statute had been observed. *Ray v. Goldsmith*, 400 N.E.2d 176, 179 (Ind. Ct.App.1980).

### A. Valve Maintenance Regulation

First, Montezuma contends that the trial court erred in determining, as a matter of law, that it violated the Valve Maintenance Regulation, 49 CFR § 192.747, and that this violation was the proximate cause of the Downs' damages.[4] The Valve Maintenance Regulation provides, in pertinent part, as follows: "[e]ach valve, *the use of which may be necessary for the safe operation of a distribution system,* must be checked and serviced at intervals not exceeding 15 months, but at least once each calendar year." (emphasis added). According to Montezuma, summary judgment in favor of the Downs was inappropriate because a genuine issue of material fact exists regarding whether the valve on the pipeline leading to the Downs' home was necessary for the safe operation of a distribution system and, therefore, whether the regulation applies in the instant case. Additionally, Montezuma argues that issues of fact exist regarding whether its failure to inspect the valve was the proximate cause of the Downs' injuries.[5]

### 1. Application of the Regulation

■■■■■ Initially, we address Montezuma's argument regarding the application of the Valve Maintenance Regulation. As previously stated, the inspection requirements of the Valve Maintenance Regulation only apply to valves which are necessary for the safe operation of a distribution system. According to Montezuma, the regulation is inapplicable because the valve at issue in the present case was a service-line valve, rather than a distribution valve.

In support of its argument, Montezuma designated the affidavit of Rick Nichols, the superintendent of Montezuma Utilities, who stated that a distribution valve services a large area and would only be found on a main

---

4. The Downs contend that the valve maintenance portion of the trial court's summary judgment order was based on 49 CFR §§ 192.161 and 192.365(c), which Montezuma does not appeal, as well as 49 CFR § 192.747. As a result, the Downs argue that Montezuma has waived any error in the trial court's ruling. However, our reading of the trial court's summary judgment order does not support the Downs' contention. In particular, the trial court acknowledged that

the Downs sought summary judgment on all three valve maintenance provisions, but its order granting summary judgment was limited to the provision of 49 CFR § 192.747. Thus, we do not find that Montezuma has waived any error.

5. During oral argument, Montezuma conceded that it had not inspected the valve during the preceding calender year.

pipeline, as opposed to a pipeline servicing a single residence. Additionally, Montezuma cited its own operating and maintenance plan, which provides that the Utility will "maintain a list of all distribution valves necessary for the safe operation of the distribution system." R. at 1046. Because the Downs' service-line valve was not on this list, Montezuma claims that the valve was not necessary for the safe operation of the distribution system.

The Valve Maintenance Regulation is a subpart of Part 192, which is entitled, Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards. The definitions applicable to Part 192 are contained in 49 CFR § 192.3, which provides that a distribution line is "a pipeline other than a gathering or transmission line."[6] The regulation further defines a service line as "a distribution line that transports gas from a common source of supply to (1) a customer meter or the connection to a customer's piping, whichever is farther downstream, or (2) the connection to a customer's piping if there is no customer's meter." These definitions clearly indicate that a distribution line necessarily includes all service lines, which are merely subsets of distribution lines. As a result, we conclude that the Downs' service-line valve, which connected the Downs' service line to the main distribution line, is a part of the entire distribution system. Therefore, the Downs' service-line valve is subject to the maintenance and inspection requirements of the Valve Maintenance Regulation.[7]

Having determined that the Downs' service-line valve was a distribution valve, we now consider whether the valve was necessary for the safe operation of the distribution system. As previously noted, the yearly inspection requirement contained in the Valve Maintenance Regulation applies only to those valves which are necessary for the safe operation of the distribution system. However, the regulation does not contain a test or other provision for determining whether a valve is within the regulation. Thus, we turn to another court which has considered this issue for guidance.

In *Brady v. Consol. Edison Co. of New York, Inc.* 103 Misc.2d 124, 425 N.Y.S.2d 444 (N.Y.Sup.Ct.1979), a New York trial court considered the scope of a utility's duty to inspect pursuant to the Valve Maintenance Regulation after a gas line inside a building separated, leaked gas and exploded. According to the utility, the gas line did not fall within the Valve Maintenance Regulation's inspection requirements because it was located inside a building. In addressing this issue, the New York court first noted that through its natural gas regulations, the Office of Pipeline Safety "has jurisdiction ... to regulate the transportation of gas to the point where it is used by the consumer." *Id.* at 445. The court then determined that the valve in question, which was located inside the building, did not fall within the regulations because:

> [t]he valves encompassed by [the Valve Maintenance Regulation] are only those which would significantly reduce the time

---

**6.** A gathering line is "a pipeline that transports gas from a current production facility to a transmission line or main." A transmission line is "a pipeline, other than a gathering line, that:
 (a) Transports gas from a gathering line or storage facility to a distribution center, storage facility, or large volume customer that is not downstream from a distribution center;
 (b) Operates at a hoop stress of 20 percent or more of SMYS; or
 (c) Transports gas within a storage field. A large volume customer may receive similar volumes of gas as a distribution center, and includes factories, power plants, and institutional users of gas."
Neither party suggests that the Downs' service line was either a gathering line or a transmission line.

**7.** Montezuma also argues that because other regulations address service-line valves and do not contain inspection requirements, "service lines and service-line valves are not necessarily encompassed by the regulations dealing with requirements for distribution systems." Appellants' Brief at 11. We disagree. The regulations to which Montezuma points are not included in Subpart M, the maintenance provisions, but are in Subpart G, the construction requirement provisions. Therefore, it is not surprising that the regulations do not contain inspection requirements. Further, no additional regulations within Subpart M, the maintenance provisions, refer specifically to service-line valves.

it takes an operator to safely stop the flow of gas in an emergency. Intended by this section are only curb valves or distribution system sectionalizing valves which enable the operator to shut down a section or grid the distribution system in an emergency.

*Id.* at 446.

■ Similarly, we find that the Valve Maintenance Regulation's reference to valves which are necessary for the safe operation of a distribution system is intended to include those valves which enable the utility to safely handle a natural gas emergency. In the instant case, the accident report prepared by the NTSB, which Montezuma does not dispute, reveals that immediately after the explosion, Montezuma shut down several gas lines in order to minimize the damage. In particular, the report reveals that Montezuma shut down the gas meter to the Downs' demolished home and another polyethylene gas line, presumably located on the main gas line running outside the Downs' home. Additionally, Montezuma shut down the valve located in the curb box outside the Downs' home, which connected the Downs' service line to the main gas line. In order to access the curb box, however, Montezuma had to excavate a large tree which had "grown over and around the curb box and the service line. The roots from this tree had to be cut with a backhoe to complete the excavation." R. at 85. .

From this evidence, it is apparent that the Downs' service-line valve, located inside the curb box, was necessary for Montezuma to shut off the flow of gas to the Downs' home in an emergency. Because Montezuma failed to present evidence to the contrary, other than its argument that the valve was not part of the distribution system, we must conclude that the Downs' service-line valve was necessary for the safe operation of the distribution system and, thus, was within the scope of the Valve Maintenance Regulation.

### 2. Violation of the Regulation

■ Having determined that the Downs' service-line valve was subject to the yearly inspection requirements of the Valve Maintenance Regulation, we must consider whether Montezuma violated these requirements.

The record in the instant case reveals that the tree root which overgrew the curb box placed pressure on the corroded steel service line, which caused the gas to leak. Further, it is apparent from the extent of effort necessary to access the curb box that Montezuma did not inspect or maintain the valves on a yearly basis as required by the regulation. Finally, Montezuma presents no evidence, such as records or testimony, that it engaged in such inspection. Although we are required to construe all facts and inferences in favor of the nonmoving party, we find no issue of fact exists regarding whether Montezuma violated its statutory duty to inspect and maintain the Downs' service-line valve. Thus, we affirm the trial court's grant of summary judgment in favor of the Downs on this issue.

### 3. Proximate Cause

■ Next, Montezuma contends that the trial court erred in determining as a matter of law that its violation of the Valve Maintenance Regulation was the proximate cause of the Downs' damage. As we previously noted, the violation of a statute does not result in liability unless the injury was in some manner proximately caused by the violation. *Conway,* 549 N.E.2d at 1095. A negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated. *City of Portage v. Lindbloom,* 655 N.E.2d 84, 86 (Ind.Ct.App.1995), *trans. denied.*

■ In the instant case, Montezuma does not challenge the finding of the NTSB that the explosion at the Downs' home was caused by the corrosion of the service line which was enhanced by pressure from tree roots which had overgrown the curb box containing the valve. Instead, Montezuma argues that the Downs presented no evidence that its failure to inspect the curb box contributed to the explosion. Further, Montezuma argues that the only foreseeable consequence of its failure to inspect the service-line valve "would be that a leak in the valve or some other problem with the valve would go undetected." Appellant's Brief at 13. We disagree.

■ Here, the evidence is undisputed that the corrosion of the valve and the pressure from the tree roots caused a gas leak, which seeped through and pooled beneath the Downs' home and, when ignited, caused the home to explode. Had Montezuma inspected the valve as required by the Valve Maintenance Regulation, it would have discovered the tree root which eventually engulfed the valve and removed it, decreasing the external pressure on the valve which contributed to the leak and subsequent explosion. Montezuma's argument that the only foreseeable consequence of not inspecting the valve was that a leak would go undetected ignores the fact that the inspection requirements are designed to prevent leaks, not to remedy them once they occur. Given the highly explosive nature of natural gas, Montezuma should have foreseen that its failure to inspect the valves and, therefore, to prevent potential leaks, could result in an explosion. As a result, we affirm the trial court's determination that Montezuma's failure to inspect the Downs' service-line valve was the proximate cause of the Downs' injuries.

### B. Exposed Pipeline Regulation [8]

■ Next, Montezuma challenges the trial court's determination that it was negligent per se for violating the Exposed Pipeline Regulation, 49 CFR § 192.459, which provides:

Whenever an operator has knowledge that any portion of a buried pipeline is exposed, the exposed portion must be examined for evidence of external corrosion if the pipe is bare, or if the coating is deteriorated. If external corrosion is found, remedial action must be taken to the extent required by § 192.483 and the applicable paragraphs of §§ 192.485, 192.487, or 192.489.

In the instant case, the evidence is undisputed that the Downs' service line was exposed

in late 1991 or early 1992 when Black's Pipeline replaced the gas main under Jefferson street, in front of the Downs' home, with a polyethylene pipeline. The only issue, then, is whether Montezuma inspected the Downs' service line at that time.

In support of their motion for summary judgment on this issue, the Downs designated the deposition of Rick Nichols, the superintendent for Montezuma Utilities, who Montezuma had designated as its representative. In his deposition, Nichols testified as follows:

Q: Going back to, in 1992, when the service pipes would have been exposed as part of the installation of the four-inch pipe, did—were the service pipes at that time inspected for corrosion?

A: I did not inspect them.

Q: Do you know if they were inspected by the town?

A: No, I did not.

. . .

Q: Did the town have as a goal inspection of those service lines during the time they were exposed during the installation of the four-inch line below the line, service line?

A: Not to my knowledge.

. . .

Q: When you say not to your knowledge, wouldn't you be aware of that if it had occurred?

A: Not necessarily, not at that time.

R. at 856–857. In addition, the Downs designated the NTSB accident report, which provided as follows:

In 1991, when the 4–inch PE line was installed, along the west side of Jefferson Street, Montezuma Utilities could have inspected the bare steel service line to 1113 Jefferson Street for corrosion. The Safety

---

8. Normally our resolution of Issue A would render it unnecessary to address Montezuma's remaining arguments. In the instant case, however, the total extent of Montezuma's liability is relevant to the determination of the liability of the remaining defendants under the Comparative Fault Act. See Shand Mining, Inc. v. Clay County Bd. of Com'rs, 671 N.E.2d 477, 479–480 (Ind.Ct. App.1996) (jury may consider negligence of governmental entity in allocating fault among joint tort feasors, even though governmental entity is not subject to liability under CFA), trans. denied. As a result, we will address Montezuma's remaining challenges to the trial court's partial summary judgment order.

Board has learned that there is no record of this having been done.

R. at 86.

In response, Montezuma submitted the affidavit of Monte Black of Black Pipeline, who stated that "[a]fter the excavation in question, the area was inspected by representatives of the Town of Montezuma who were then and there present. . . ." R. at 904. According to Montezuma, this affidavit raises a genuine issue regarding whether it inspected the exposed pipeline at the time of the excavation. In addition, Montezuma argues that the Downs' evidence did not definitively show that no inspection took place; rather, it only revealed that Nichols and the NTSB had no information regarding whether an inspection occurred. We disagree.

Initially, we note that Black's affidavit was submitted in support of Black Pipeline's motion for summary judgment. The purpose of Black's testimony was to show that its excavation activities did not dent or bend existing pipes. The affidavit indicates that the inspection to which Mr. Black referred occurred after the excavation project was complete, not during the time that the pipeline was exposed. Further, Black's affidavit does not indicate that Montezuma personnel inspected the pipeline for external corrosion or deterioration.

 Additionally, the evidence presented by the Downs, including the NTSB report and Nichols' deposition, indicates, at the very least, that no evidence exists that Montezuma inspected the pipeline. Although Nichols did not state conclusively that the pipeline was not inspected, he stated that he was unaware of an inspection. Given that Nichols was designated by Montezuma as its representative for the deposition, his statements are binding upon it. *See* Ind.Trial Rule 30(B)(6) (organization named in discovery request shall designate person authorized to testify

on its behalf, who shall testify to matters known or available to organization). Under these circumstances, we conclude that Montezuma presented no evidence to raise a genuine issue as to whether it inspected the pipelines.[9] Thus, the trial court correctly determined that Montezuma was negligent per se for violating the Exposed Pipeline Regulation.

### C. Surveillance and Excavation Regulations

In a third challenge to the trial court's summary judgment order, Montezuma contends that the court erred in determining, as a matter of law, that it violated the Surveillance Regulation, 49 CFR §§ 192.613, and the Excavation Regulation, 49 CFR § 192.614(a). The Surveillance Regulation provides, in pertinent part, as follows:

(a) Each operator shall have a procedure for continuing surveillance of its facilities to determine and take appropriate action concerning changes in class location, failures, leakage history, corrosion, substantial changes in cathodic protection requirements, and unusual operating and maintenance conditions.

49 CFR § 192.613. Further, the Excavation Regulation provides that "[e]xcept for pipelines listed in paragraph (c) of this section, each operator of a buried pipeline shall carry out in accordance with this section a written program to prevent damage to that pipeline by excavation activities." 49 CFR § 192.614. According to Montezuma, it presented sufficient evidence in opposition to the Downs' summary judgment motion to raise a question of fact regarding whether it complied with these regulations.

 Initially, we note that the parties disagree as to whether the Surveillance and Excavation Regulations require the utility to have written policies or procedures, or

---

**9.** We reject Montezuma's contention that it was the Downs' burden to prove conclusively that no inspection occurred. The summary judgment standard clearly provides that after the movants show they are entitled to summary judgment, the burden shifts to the non-movant to establish a genuine issue of material fact. Here, the Downs presented evidence that no record of an inspection existed. This was sufficient to satisfy

their burden. It was then incumbent upon Montezuma to come forward with evidence that it inspected the exposed pipeline, particularly because this evidence was within Montezuma's exclusive control. To require the Downs to affirmatively prove that the pipeline was not inspected would require them to prove a negative, something which we refuse to do.

whether the utility is merely required to provide written evidence that the surveillance and damage prevention activities occurred. Although the regulations clearly provide that the utility "shall have a procedure for continuing surveillance" and a "written program to prevent damage," Montezuma contends that, pursuant to 49 CFR § 192.603(b), all the regulation requires is for it to "keep records necessary to administer the procedures." We disagree.

The clear intent of the regulations is to require natural gas utilities to establish written policies and procedures to ensure a reasonable level of safety. Further, the regulations, particularly the Excavation Regulation, identify specific provisions that must be included in the written programs, including procedures for identifying persons who normally engage in excavation activities, notifying persons in the vicinity of the pipelines of the excavation, receiving and recording notification of excavation activities and temporarily marking pipelines in the area of excavation activities. Therefore, to comply with the Surveillance and Excavation Regulations, Montezuma was required to have written plans or policies for surveillance and damage prevention.[10]

Here, in support of their motion for summary judgment, the Downs designated evidence demonstrating that no such written policies or procedures existed. Specifically, the Downs presented the NTSB report, which provides in part:

[The Surveillance Regulation] states that each operator shall have a procedure for continuing surveillance of its facilities to determine and take appropriate action con-

cerning changes in leakage history, corrosion and other unusual operating and maintenance conditions. Although this procedure has been requested from Montezuma Utilities, to date the Safety Board has not received this procedure.

R. at 85. Additionally, the Downs presented the affidavit of an expert, Dr. Douglas Chisholm, who was formerly the Chief of Research of the Office of Pipeline Safety of Research and Special Programs Administration for the Department of Transportation. Dr. Chisholm reviewed Montezuma's materials and concluded that it "has not provided the NTSB its procedures for continuing surveillance and there is no evidence of such a procedure in place or being followed." R. at 221–222.

In response, Montezuma designated evidence showing that it had conducted cathodic protection and leak surveys, that its meter readers made monthly checks for leaks and that it had a program for reconditioning lines and replacing lines which could not be reconditioned. Further, Montezuma presented its Operating and Maintenance Plan, which discusses the policy and procedure for surveillance of the lines. R. at 1045–59. Specifically, the Plan includes policies for leakage surveys, inspecting and servicing valves and cathodic protection surveys, which includes corrosion control monitoring. Based upon this evidence, we find that Montezuma presented a question of fact regarding whether it complied with the requirements of the Surveillance Regulation. However, none of Montezuma's designated evidence showed that it had similar policies or procedures for excavation activities.[11]

---

**10.** Montezuma also argues that the Excavation Regulation is not intended to apply to the Downs' situation, as its purpose is "to prevent persons doing excavation work from unknowingly damaging underground pipelines." Appellant's Brief at 21. However, the question of whether this regulation is intended to benefit the Downs, and whether Montezuma's violation of this regulation entitles the Downs to recover, is included in the determination of whether a violation of the regulation proximately caused the Downs' injuries. As noted in the trial court's order, the Downs were denied summary judgment on the issue of proximate cause. Thus, we need not consider Montezuma's argument.

Nevertheless, we find it hard to believe that the Excavation Regulation was solely intended to protect those persons involved in excavation activities. Were that the case, the regulation would not require written procedures for informing persons in the vicinity of the excavation activities. Instead, we believe, as stated previously, that the purpose of the regulations is to ensure the safety of all persons, including the Downs, from the highly-explosive properties of natural gas.

**11.** Again, we reject Montezuma's contention that it was the Downs' responsibility to conclusively establish that such policies did not exist, as the

Thus, we reverse the trial court's grant of summary judgment on Montezuma's alleged violation of the Surveillance Regulation, but affirm the grant of summary judgment based upon its violation of the Excavation Regulation.

### IV. Limitation of Liability

■ On cross-appeal, the Downs contend that the trial court erroneously denied their motion for summary judgment on the issue of the limitation of liability provision of the Indiana Tort Claims Act (ITCA).[12] Under the ITCA, the amount of damages that may be assessed in tort against a governmental entity is limited as follows:

> The combined aggregate liability of all governmental entities and of all public employees, acting within the scope of their employment and not excluded from liability under section 3 of this chapter, does not exceed three hundred thousand dollars ($300,000) for injury to or death of one (1) person in any one (1) occurrence and does not exceed five million dollars ($5,000,000) for injury to or death of all persons in that occurrence.

IND.CODE § 34–4–16.5–4. According to the Downs, because Montezuma had liability insurance at the time of the accident with policy limits in excess of those imposed by the ITCA, it has waived the statutory limits to the extent of its policy coverage.

In support of their argument, the Downs rely on another section of the ITCA which permits governmental entities to purchase insurance. This section provides:

> [a] governmental entity may purchase insurance to cover the liability of itself or its employees. Any liability insurance so purchased shall be purchased by invitation to and negotiation with providers of insurance and may be purchased with other types of insurance. *If such a policy is purchased, the terms of the policy govern the rights and obligations of the governmental entity and the insurer with respect to the initiation, settlement and defense of claims* or

suits brought against the governmental entity or its employees covered by the policy. IND.CODE § 34–4–16.5–18 (emphasis added). Pursuant to this section, the Downs argue that the terms of Montezuma's insurance policy should determine and control the extent of its liability.

■ When construing a statute, our foremost duty is to determine and give effect to the true intent of the legislature. *Indiana Dep't of Human Services v. Firth,* 590 N.E.2d 154, 157 (Ind.Ct.App.1992), *trans. denied.* To do this, we must view the statute within the context of the entire act, rather than in isolation. *Id.* Absent a clearly manifested purpose to the contrary, we endeavor to give words appearing in the statute their plain and ordinary meaning. *Id.* We will not construe statutes in a manner leading to absurdity or hardship. *Id.*

Another panel of this court recently addressed the issue presented here. In *In re Train Collision at Gary, Ind. on Jan. 18, 1993,* 654 N.E.2d 1137 (Ind.Ct.App.1995), *trans. denied,* plaintiffs, who were passengers and personal representatives of deceased passengers involved in a head-on train collision, appealed the trial court's determination that the Northern Indiana Commuter Transportation District's (NICTD) liability was limited by the ITCA. Specifically, the plaintiffs claimed, similar to the instant case, that the NICTD's procurement of excess liability insurance constituted a waiver of the liability limitations of the ITCA to the extent of the insurance coverage.

In support of their argument, the plaintiffs in *In re Train Collision* relied on *Flowers v. Board of Com'rs of Vanderburgh County,* 240 Ind. 668, 168 N.E.2d 224 (1960), a case also cited by the Downs. In *Flowers,* a plaintiff filed a complaint against the Board of Commissioners and the Park Board after she suffered injuries while roller-skating in the park. At that time, governmental entities were entitled to immunity from tort liability for their negligence. However, Burns 39–1819, the predecessor to I.C. § 34–4–16.5–18 of the ITCA, provided that if a county pur-

---

evidence whether such a policy existed was exclusively in the control of Montezuma.

**12.** IND.CODE §§ 34–4–16.5–1 to 34–4–16.5–22.

chased a liability insurance policy and a cause of action arose, the insurance carrier could not rely on sovereign immunity as a defense. *Id.* at 225. Based upon this statute, our supreme court held that where a governmental entity purchased liability insurance, the insurance carrier waives governmental immunity as a defense to the suit. *Id.*

Since *Flowers*, the common law defense of governmental immunity has been replaced by the ITCA. The ITCA no longer provides for waiver of the limitations of liability. For this reason, this court held in *In re Train Collision* that the NICTD did not waive the statutory limitation on its liability by purchasing insurance. In particular, we found:

Neither the fact that the Legislature required NICTD to purchase liability insurance under the Transportation Act nor the fact that governmental entities have the power to purchase insurance under the Tort Claims Act lead us to conclude that the Legislature intended for such purchases to provide a waiver of the liability limitations.

*Id.*[13] *See also Rodgers v. Martinsville School Corp.*, 521 N.E.2d 1322, 1325 (Ind.Ct. App.1988) (governmental entity's purchase of liability insurance did not waive notice requirements of ITCA), *trans. denied.*

■ We find *In re Train Collision* persuasive. The purpose of the limitation of liability provision of the ITCA is

to limit the financial responsibility of the state by restricting damages in tort in order to protect the fiscal integrity of gov-

ernmental bodies. Liability limitations on a person's recovery against the state or a political subdivision are designed to preserve public treasuries, protect against the possibility of unusually large recoveries, and discourage excessive litigation.

*Id.*, 654 N.E.2d at 1146 (citation omitted). In accordance with this purpose, therefore, we do not believe that a governmental entity that chooses to insure itself, even in excess of its liability, has waived the limits expressly established by the legislature. Were we to find otherwise, we would ignore the intent of the legislature as expressed in the statute. Further, we are mindful of the general rule that once the legislature acts in a particular area, it has preempted all other activity in that area. *Yeager v. Bloomington Obstetrics and Gynecology, Inc.*, 585 N.E.2d 696, 699 (Ind.Ct.App.1992), *aff'd* 604 N.E.2d 598 (Ind. 1992). Because the legislature has chosen to restrict governmental liability in this area, we cannot stray from its express limitations. For these reasons, we agree with the trial court's determination that the Downs' recovery is limited by the ITCA and we affirm summary judgment in favor of Montezuma on this issue.[14]

### V. Conclusion

In sum, we affirm the trial court's grant of summary judgment in favor of the Downs on the issue of Montezuma's negligence per se for violating the Valve Maintenance Regulation, the Exposed Pipeline Regulation and the Excavation Regulation. Additionally, we affirm the trial court's determination that

---

**13.** The Downs contend that *In re Train Collision* is distinguishable from the present case because the NICTD was required to purchase liability insurance by statute, whereas Montezuma's purchase of insurance was voluntary. As a result, the Downs argue that, unlike the NICTD, Montezuma's purchase indicates its voluntary waiver of the limitation of liability provisions. However, the holding in *In re Train Collision* is based upon the same statutory provisions at issue in the instant case. Thus, the holding is unaffected by whether the governmental entity in question was required to purchase insurance or merely had the option of purchasing insurance. In fact, the holding explicitly states that the fact that a governmental entity has the power to purchase insurance does not indicate a legislative intent for such a purchase to waive the liability limitations.

*Id.*, 654 N.E.2d at 1146. As a result, we reject the Downs' contention that the cases are distinguishable.

**14.** We note that our determination that Montezuma's purchase of excess liability coverage does not waive the limitations on its liability results in a benefit to Montezuma's insurer: the excess coverage for which Montezuma paid is now illusory, as it will never be needed. In light of this result, we encourage governmental entities and their insurers to review their policies to ensure that the public does not continue to pay for illusory coverage. We further note that it may be appropriate for governmental entities who have paid for this illusory coverage to seek reimbursement from their insurers.

Montezuma's violation of the Valve Maintenance Regulation was the proximate cause of the Downs' damages. However, we reverse the trial court's entry of summary judgment in favor of the Downs on the issue of Montezuma's violation of the Surveillance Regulation. On the Downs' cross-appeal, we affirm the trial court's determination that Montezuma's liability is limited by the ITCA and affirm summary judgment in its favor on this issue. We remand to the trial court for further proceedings consistent with this opinion.

Judgment affirmed in part, reversed in part and remanded.

ROBERTSON, J., concurs.

KIRSCH, J., concurs and dissents, with opinion.

KIRSCH, Judge, concurring and dissenting.

I fully concur in the majority's resolution of all issues in the appeal brought by the Town of Montezuma and the Montezuma Municipal Gas Utility. From their denial of the Downs' cross-appeal, however, I respectfully dissent.

The majority follows *In re Train Collision at Gary, Ind. on Jan. 18, 1993,* 654 N.E.2d 1137 (Ind.Ct.App.1995), in which a panel of this court held that a governmental entity's procurement of liability insurance coverage in excess of the liability limitation in the Indiana Tort Claims Act (ITCA) did not constitute a waiver of the limitation. The *In re Train Collision* case was based upon the conclusion that there was no showing "that the Legislature intended for such purchases to provide a waiver of the liability limitations." *Id.* at 1149. ITCA, however, contains no indication of legislative intent on the issue. ITCA did not restrict the ability of governmental entities to purchase liability insurance. Such entities are free to purchase coverage in excess of the limitation on their liability. When they do so, they must do so with the intent that the insurance which they procure and pay for will be available to compensate those who are injured as the result of governmental torts.

None of the purposes of the limitation of liability provision of ITCA which are set out in the majority opinion will be thwarted by this construction. The financial integrity of governmental bodies will not be threatened; public treasuries will be preserved; unusually large recoveries will not be common place; excessive litigation will not be encouraged. Rather, all that will happen is that an insurance carrier will be held liable for the coverage it agreed to provide.

The Downs' family sustained a devastating loss. The Town of Montezuma insured against that loss by procuring liability insurance coverage in excess of the limitation of the Indiana Tort Claims Act. The liability insurance carrier bargained for and received premiums for the full amount of the coverage provided. This court is faced with the choice between under compensating the Downs for their terrible loss or unjustly enriching the liability carrier which bargained for and received a premium for the excess coverage. The choice is clear. Failing to hold an insurance company liable for the coverage which it freely agreed to provide and for which it was fully compensated is neither good law nor good policy.