**J. Gordon EDWARDS, Ph.D., Thomas H. Jukes, Ph.D., Robert H. White-Stevens, Ph.D., Plaintiffs-Appellees,**

v.

**NATIONAL AUDUBON SOCIETY, INC., Robert S. Arbib, Jr., Elvin J. Stahr, Jr., Defendants,**

**and**

**The New York Times Company and Roland C. Clement, Defendants-Appellants.**

Nos. 1026, 1027, Dockets 77–7018, 77–7034.

United States Court of Appeals, Second Circuit.

Argued May 10, 1977.

Decided May 25, 1977.

See also, D.C., 411 F.Supp. 744.

Floyd Abrams, New York City (Eugene R. Scheiman, Ruth D. MacNaughton, and Cahill Gordon & Reindel, New York City, of counsel), for defendant-appellant New York Times Co.

Morris Zweibel, Mineola, N. Y. (Gifford, Woody, Càrter & Hays, New York City, and Crowe, McCoy, Agoglia, Fogarty & Zweibel, P.C., Mineola, N. Y., of counsel), for defendant-appellant Roland C. Clement.

Thomas A. Rothwell, Washington, D. C. (Arthur H. Berndtson, and Rothwell, Capello & Berndtson, Washington, D. C., of counsel), for plaintiffs-appellees.

Before KAUFMAN, Chief Judge, CLARK, Associate Justice * and JAMESON, District Judge.**

IRVING R. KAUFMAN, Chief Judge:

In a society which takes seriously the principle that government rests upon the consent of the governed, freedom of the press must be the most cherished tenet. It is elementary that a democracy cannot long survive unless the people are provided the information needed to form judgments on issues that affect their ability to intelligently govern themselves. As we said in *James v. Board of Education*, 461 F.2d 566, 572, "To preserve the 'marketplace of ideas' so essential to our system of democracy, we must be willing to assume the risk of argument and lawful disagreement." In the thirteen years since *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the federal courts have steadfastly sought to afford broad protection to expression by the media, without unduly sacrificing the individual's right to be free of unjust damage to his reputation. *See, e. g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). This important case requires us to return again to this task.

We are invited today to affirm a libel judgment against the *New York Times* for accurately reporting dramatic statements of the National Audubon Society attacking the good faith of prominent scientists supporting continued use of the insecticide DDT. There can be little doubt that the *Times* reasonably considered these accusations of a leading environmentalist organization to be newsworthy. We are further requested to affirm judgments against Roland Clement, a Vice-President of the Society, despite the absence of any evidence in the record that he endorsed or made the single statement that could be found to have been libelous under the Constitution. We are convinced that the First Amendment requires us to decline these invitations. Accordingly we will reverse and order the complaint dismissed.

I.

A brief summary of the facts is indispensable to understanding the difficult legal issues presented by this appeal.

*The DDT debate.* The publication fifteen years ago of Rachel Carson's *Silent Spring* set off a furious controversy that, even today, continues to rage around the insecticide DDT. Naturalists and environmentalist groups like the National Audubon Society have vigorously opposed DDT because, in their view, use of the chemical endangers bird life. Proponents of the pesticide deny this charge and forcefully urge that, with-

---

* Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation.

** William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

out DDT, millions of human beings will die of insect-carried diseases and starvation caused by the destruction of crops by insect pests.

As might be expected when such fundamental questions of value enter the debate, at times the DDT controversy has exceeded the limits of temperance and good manners. Naturalists have insinuated that many proponents of DDT are unduly influenced by the selfish interests of the pesticide industry. On the other hand, such an outstanding advocate of DDT as appellee Dr. J. Gordon Edwards, has characterized a ban on export of the insecticide, supported by the Audubon Society, as "deliberately genocidal."[1] Accusations of scientific bad faith have unfortunately become almost commonplace on both sides.

*Arbib's "Foreword" to American Birds.* The scientists who advocate continued use of DDT respond to charges that the chemical destroys bird life by citing the annual Audubon Society Christmas Bird Count, which shows a steady increase in bird sightings despite the growing employment of pesticides in the last thirty years. The Audubon Society believes this is an invalid use of its statistics because there are many more bird counters now and because bird watchers have grown more skilful in recent years with better access to observation areas. This dispute over the interpretation of the Society's statistics lies at the heart of the controversy over DDT's threat to bird life.

By 1972 the DDT controversy was raging at peak intensity,[2] and the Audubon Society was acutely alarmed at what it considered the persistent misuse of its Bird Count data. Accordingly, Robert S. Arbib, Jr., a highly respected amateur ornithologist and editor of the Society's publication *American Birds,*

determined to preface his report of the 1971 Christmas Count with a warning against distortion of the results. His foreword to the April, 1972, issue of *American Birds,* contained the following comment on the Count's significance:

We are well aware that segments of the pesticide industry and certain paid "scientist-spokesmen" are citing Christmas Bird Count totals (and other data in AMERICAN BIRDS) as proving that the bird life of North America is thriving, and that many species are actually increasing despite the widespread and condemned use of DDT and other non-degradable hydrocarbon pesticides.

This, quite obviously, is false and misleading, a distortion of the facts for the most self-serving of reasons. The truth is that many species high on the food chain, such as most bird-eating raptors and fisheaters, are suffering serious declines in numbers as a direct result of pesticide contamination; there is now abundant evidence to prove this. In addition, with the constant diminution of natural habitat, especially salt- and freshwater marshes, it is self-evident that species frequenting these habitats are less common than formerly.

The apparent increases in numbers of species and individuals on the Christmas Bird Counts have, in most cases, nothing to do with real population dynamics. They are the result of ever-increasing numbers of birders in the field, better access to the Count areas, better knowledge of where to find the birds within each area, and increasing sophistication in identification.

With increased local coverage by the press of Christmas Bird Count activities, it is important that Count spokesmen re-

1. Edwards, Address to the 71st National Meeting of the American Institute of Chemical Engineers (February 23, 1972).

2. In March, 1972, seven months of administrative hearings on the deleterious effects of DDT use were concluded, and the Administrator of the Environmental Protection Agency, William D. Ruckelshaus, was personally struggling with the question whether to ban DDT. On June 14,

1972, Ruckelshaus revoked the registration of DDT for most purposes and ordered that use of the pesticide should be discontinued by December 31 of that year. This order was eventually affirmed by the United States Court of Appeals for the District of Columbia Circuit. *See Environmental Defense Fund v. E.P.A.,* 160 U.S. App.D.C. 123, 489 F.2d 1247 (1973).

iterate the simple and truthful fact that what we are seeing is result of *not more birds, but more birders.* Any time you hear a "scientist" say the opposite, you are in the presence of someone who is being paid to lie, or is parroting something he knows little about.

Despite the potentially explosive character of the allegation that scientists supporting DDT were paid liars, Arbib does not appear to have had any factual basis for the charge. Indeed, he testified that his comment was never intended to portray anyone in particular as a venal prevaricator; rather, it merely expressed his belief that many supporters of DDT use were spokesmen for the pesticide industry.

*The New York Times Article.* Arbib's general accusations came to the attention of *New York Times* nature reporter John Devlin in late July, 1972. Devlin immediately realized that the Audubon Society's charges were a newsworthy development in the already acrimonious DDT debate, and he accordingly telephoned Arbib to obtain the names of those the Society considered "paid liars". Arbib was initially reluctant to identify any individuals as the people referred to in his article. But, as a result of Devlin's persistent urging that many eminent persons associated with the pesticide industry might be hurt unnecessarily by the Society's indiscriminate attack, Arbib eventually promised to furnish the names of specific individuals whom he felt were justly subject to the Society's charges.

Arbib, of course, did not know of anyone in particular whom he could with assurance call a "paid liar". He turned, therefore, to Roland Clement, the Audubon Society's Staff Biologist and Vice-President, who more than any other official of the naturalist organization had embroiled himself in the DDT controversy and had knowledge of its participants. Arbib testified that Clement strongly emphasized he could not call anyone specifically a paid liar. He could, however, identify those who had most persistently misused Bird Count data, despite the Society's efforts to point out their error.

Clement told Arbib he had just completed an article for an environmentalist journal which listed the scientists whose distortion of the Audubon statistics seemed most egregious,[3] and, in Arbib's words,

> he believed it would be all right to give the names to Mr. Devlin as long as we qualified this by saying 'We don't have any knowledge of anyone being paid liars, and all we want to say is that they have been consistent misinterpretors of the information in *American Birds.*'

When Devlin telephoned again for the names, Arbib was prepared with Clement's article. But, Devlin and Arbib sharply disagreed at trial regarding the ensuing conversation. Arbib insisted that he conveyed, in essence, Clement's warning that the scientists discussed in Clement's article were not necessarily "paid liars". Devlin flatly denied that Arbib so cautioned him. He testified that Arbib made it clear that the scientists whose names were furnished to the *Times* were the persons referred to in Arbib's "Foreword" to *American Birds.* The list included the names of the appellees—Dr. J. Gordon Edwards, Professor of Entomology at San Jose State College in California, Dr. Thomas M. Jukes, Professor of Medical Physics and Lecturer in Nutrition at the University of California, Berkeley, and Dr. Robert H. White-Stevens, Professor of Biology at The Rutgers University in New Jersey—as well as Nobel Laureate Norman Borlaug and Dr. Donald Spencer, a lecturer of the National Agricultural Chemical Association. All of the accused were eminent scientists, though none were ornithologists.

Upon receiving these names from Arbib, Devlin attempted to secure comments from each of the five accused. He succeeded in reaching three: Dr. White-Stevens, Dr. Jukes, and Dr. Spencer. All of these scientists categorically denied the charges, and Dr. Spencer even referred to them as "almost libelous". Dr. White-Stevens and Dr. Jukes, in addition, sent Devlin voluminous supporting materials setting forth their side

---

3. Clement, *The Pesticides Controversy,* 2 Env. Aff. 445 (1972).

of the DDT debate. None of this material, however, responded directly to the Audubon Society's criticism of the use of Bird Count data by these scholars; it dealt almost entirely with the general merits of the pesticide controversy.

Having thus in good faith elicited both sides of the story to the best of his ability, Devlin wrote the article which is the sole ground for the libel judgment against the *Times* and the principal basis for the judgment against Clement. Devlin's story was published in thè *Times* on August 14, 1972.

Pesticide Spokesmen Accused Of 'Lying' on Higher Bird Count

By JOHN DEVLIN

"Segments of the pesticide industry and certain 'scientist-spokesmen,' " are accused in the current issue of American Birds of "lying" by saying that bird life in America is thriving despite the use of DDT.

The publication is sponsored by the National Audubon Society in collaboration with the United States Fish and Wildlife Service. The delayed current issue is devoted principally to results of the 72d Christmas Bird Count.

The accusation against the pesticide industry and some of its spokesmen is contained in the foreword by Robert S. Arbib Jr., editor.

He wrote that the reason the Christmas Bird Count showed more birds, as cited by the pesticide industry spokesmen, was not that there were more birds these days but simply "more birders" who go out on the annual counts and thus increase the size of the totals reported.

Accused Men Named

The persons under attack were not identified in the publication.

However, Mr. Arbib said in an interview that they included Robert H. White-Stevens, formerly with American Cyanamid Company, and now in the Bureau of Conservation and Environmental Science, Rutgers University; Thomas H. Jukes, a biochemist at the University of California; Norman E. Borlaug, Nobel Prize winner; Dr. J. Gordon Edwards, a lecturer and professor of entomology at San Jose State College; and Dr. Donald A. Spencer, a retired ecologist and lecturer of the National Agricultural Chemical Association who's now a private consultant and a member of the National Audubon Society.

Not all of the men could be reached for comment but those who could ridiculed the accusations as "emotional," "hysterical," and unfounded, and Dr. Spencer said they were "almost libelous."

"We are well aware," Mr. Arbib wrote, "that segments of the pesticide industry and certain paid 'scientist-spokesmen' are citing Christmas Bird Count totals and other data in American Birds as proving that the bird life of North America is thriving, and that many species are actually increasing despite the widespread and condemned use of DDT and other non-degradable hydro-carbon pesticides.

'Serious Declines' Found

"This, quite obviously, is false and misleading, a distortion of the facts for the most self-serving reasons. The truth is that many species high on the food chain, such as most bird-eating raptors and fish-eaters, are suffering serious declines in numbers as a direct result of pesticide contamination; there is now abundant evidence to prove this."

He said that with the increased coverage of Christmas Bird Counts by the press, it was important for Christmas Count spokesmen to "reiterate what we are seeing is not more birds but more birders.

"Anytime you hear a 'scientist' say the opposite," he continued, "you are in the presence of someone who is being paid to lie, or is parroting something he knows little about."

*The Clement letter.* Roland Clement was astonished to read in the *Times* that the Audubon Society had called its critics "paid liars." In an internal memorandum circulated the following day, Clement wrote:

Arbib was probably incautious in giving Devlin the names involved, something he got from me. Devlin probably asked whom do you consider liars, and Arbib was trapped into listing people I have never called liars, though they may be.

Nonetheless, Clement apparently decided that the unfortunate situation could best be turned to advantage by playing down the accusation against the appellees, Spencer, and Borlaug while reiterating and clarifying the Society's position on the merits of the Bird Count controversy. Accordingly, Clement sent the following letter to the *Times* over Arbib's signature.

Jack Devlin's punchy piece on the Audubon Christmas Bird Count summary . . . unfortunately leaves out the most important qualifications we attach to these counts.

It is not simply that more birds are reported because there are more birders, but that we have more birders who are also better birders . . ..

Nor do we like to call people liars, but those who have most consistently misused our data—Robert H. White-Stevens . . ., Thomas H. Jukes . . ., Donald A. Spencer . . ., J. Gordon Edwards . . ., and more recently Nobel laureate Norman E. Borlaug—certainly have had time to learn from our patient explanations of their misinterpretations of our data over the several years of the DDT controversy.

Judge Metzner ruled this letter libelous per se, though it eschewed all the suggestions of venality that had appeared in the *American Birds* Foreword and *Times* article, and though it fully explained the basis for Clement's view that the scientists were in bad faith. The letter was never published by the *Times*.

*Litigation.* The appellees filed their complaints against the *Times* and the National Audubon Society in April, 1973; subsequently Arbib and Clement were added as

defendants. After nearly three years of discovery, Judge Metzner denied the defendants' motion for summary judgment, on the sole ground that there was a disputed issue of fact: whether Arbib actually told Devlin that those whose names were being furnished to the *Times* were not the "paid liars" referred to in *American Birds*. Despite his finding that the appellees were "public figures",[4] Judge Metzner was of the view a jury might find actual malice on the part of one or another defendant, depending upon its resolution of this question of fact, even in the face of *New York Times v. Sullivan, supra.*

· The district judge further simplified the issues by ruling that both the *New York Times* article of August 14, 1972, and Clement's rebuttal letter of the same day were defamatory *per se* because they impugned the professional integrity of the appellees. In addition, the jury was instructed that the *Times* could be found guilty of actual malice if Devlin had serious doubts about the truth of the statement that the appellees were paid liars, even if he did not have any doubt that he was reporting Arbib's allegations faithfully. The jury returned a verdict against both the *Times* and Clement, but exonerated Arbib. It awarded $20,000 damages to Dr. Jukes and Dr. White-Stevens, respectively, and $21,000 to Dr. Edwards.

The *Times* and Clement moved for judgment n. o. v. Judge Metzner interpreted the surprising verdict against *both* appellants as reflecting the jury's belief that, although Devlin had accurately reported the information received from Arbib, he had been "reckless" in failing to investigate further after the responses from White-Stevens, Jukes, and Spencer placed him on *notice of the defamatory potential* of his proposed article. The evidence, in his view, was sufficient to support this finding, and accordingly Judge Metzner denied the *Times'* motion. The basis for Clement's liability was

4. The district court's finding that the appellees were "public figures", at least within the context of the DDT controversy, is unchallenged on this appeal. It is accordingly conceded that

the jury's verdict cannot be upheld unless it is based on clear and convincing evidence of "actual malice". *New York Times v. Sullivan, supra.*

the jury's implicit finding that Clement gave Arbib the appellants' names knowing the purpose for which they would be used. Judge Metzner regarded the evidence sufficient to support this conclusion.

## II.

■ Implicit in the jury's verdict against Clement is the finding, which we must accept, that the *Times* accurately reported the five scientists whose names were furnished by Arbib were the "paid liars" referred to in the *American Birds* Foreword. We believe that a libel judgment against the *Times*, in the face of this finding of fact, is constitutionally impermissible.

At stake in this case is a fundamental principle. Succinctly stated, when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity. *See Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Medina v. Time, Inc.*, 439 F.2d 1129 (1st Cir. 1971). What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation. *Cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them.

The contours of the press's right of neutral reportage are, of course, defined by the principle that gives life to it. Literal accuracy is not a prerequisite: if we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made. *Time, Inc. v. Pape, supra*. It is equally clear, however, that a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he assumes responsibility for the underlying accusations. *See Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969), *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).

It is clear here, that Devlin reported Audubon's charges fairly and accurately. He did not in any way espouse the Society's accusations: indeed, Devlin published the maligned scientists' outraged reactions in the same article that contained the Society's attack. The *Times* article, in short, was the exemplar of fair and dispassionate reporting of an unfortunate but newsworthy contretemps. Accordingly, we hold that it was privileged under the First Amendment.

## III.

■ Even absent the special protection afforded to neutral reportage, *see Time, Inc. v. Pape, supra*, the evidence adduced at trial was manifestly insufficient to demonstrate "actual malice" on the part of the *Times*. It is uncontested that Devlin was unaware of the baselessness of the Audubon Society's dramatic allegations. Nor was there a shred of evidence from which the jury might have found that Devlin entertained serious doubts concerning the truth of Arbib's charge that the appellees were "paid liars."

It is conceded that the *Times* might have published the Audubon Society's accusations without fear of liability had Devlin but refrained from eliciting the views of the Society's victims. The appellees would punish the *Times* for its effort to confirm the story, apparently maintaining that a little prudence is a dangerous thing. They assert that once Devlin heard the scientists'

denials and received materials explaining their general stand in the DDT controversy, he became charged with the duty to publish absolutely nothing until he conducted a full-scale investigation plumbing to the bottom of the matter.

We do not believe, however, that the scientists' responses to Devlin's inquiries could be found sufficient to warn Devlin of the probable falsity of the Society's charges. Surely liability under the "clear and convincing proof" standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and counter-charge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error. Nor, in our view, did the availability of a mass of materials, largely irrelevant to the Bird Count controversy, and completely irrelevant to the assertedly libelous accusations of the Audubon Society, provide any basis for a finding that Devlin knew the charges were probably false. Accordingly, even if the *Times* were required to assume direct responsibility for the accusations, it could not, consistent with *New York Times v. Sullivan, supra,* be found liable for defamation.[5]

## IV.

■ We conclude also that the evidence was insufficient to support the jury's verdict against Roland Clement.

**5.** The *Times* vigorously argues that Judge Metzner erred in ruling Devlin's article to be libel *per se*. The *Times* carefully notes that an allegedly libelous statement must be evaluated in the light of First Amendment mandates and with full regard to the context of the assertedly defamatory utterance. *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). Since the scientific community, whose opinion of the appellees is of special concern, would be accustomed to extravagant charges in connection with the DDT debate, the *Times* urges that it would not have regarded the Audubon Society's allegations as defamatory. At the very least, the *Times* suggests, the evidence offered to show the heat of the DDT controversy should have been admitted and the issue of whether the statements were defamatory left to the jury.

It is helpful in analyzing Mr. Clement's asserted liability to understand precisely what aspect of the Audubon Society's charges constituted a libelous assault on the character of the appellees. It is plain that the letter Clement sent to the *Times* August 14, 1972, was not defamatory. The critical language of that communication was as follows:

Nor do we like to call people liars, but those who have most consistently misused our data [including the appellees] certainly have had time to learn from our patient explanations. . . .

Absent from this passage is the critical allegation that the appellees were *paid* liars. The epithet "liar" in this context, standing by itself, merely expressed the *opinion* that anyone who persisted in misusing Audubon statistics after being forewarned could not be intellectually honest. Since the basis for this opinion was fully set forth, the communication of Clement's views cannot be libelous, however mistaken they might be. *Hotchner v. Castillo-Puche*, 551 F.2d 910 (2d Cir. 1977).

Unfortunately, the Audubon Society's principal charges, as reported in Devlin's article for the *Times*, went far beyond a mere accusation of scientific bad faith. The appellees were charged with being "paid to lie". It is difficult to conceive of any epithet better calculated to subject a scholar to the scorn and ridicule of his col-

Under the particular circumstances presented in this case, we do not find any error in the ruling of the district court. Devlin's article does not even arguably present the difficult problem of carefully parsing statements to see if they are expressions of opinion rather than fact. Contrast *Buckley v. Littell, supra* at 892–895. As we explain below, to call the appellees, all of whom were university professors, *paid* liars clearly involves defamation that far exceeds the bounds of the prior controversy. No allegation could be better calculated to ruin an academic reputation. And, to say a scientist is *paid* to lie implies corruption, and not merely a poor opinion of his scientific integrity. Such a statement requires a factual basis, and no one contends there was any serious basis for such a statement in this case.

leagues than "paid liar." It is this completely foundationless accusation of venality that constitutes the essence of the calumny against the appellees.

Because of the unusual circumstances presented here, however, it is difficult to assign responsibility for the false denunciation of the appellees as paid liars. Arbib, of course, was exonerated by the jury. But, there is scarcely a wisp of evidence in the record from which it could be inferred that Arbib's associate at the Audubon Society, Clement, supplied Arbib with the appellees' names, *knowing* they would be portrayed as paid liars. Indeed, Arbib's testimony was completely uncontradicted, that Clement provided the names of prominent spokesmen on behalf of DDT only on condition that Devlin be told "we are not calling anyone paid liars." Of course, the jury evidently found that Arbib failed to warn Devlin that he was not calling the appellees paid liars, though he did caution against naming them in a *Times* article. But this failure can hardly be attributed to Clement, who on the morrow of the *Times* article confidently expressed his belief that Arbib had been "trapped" into identifying the appellees as those referred to as paid liars in the *American Birds* Foreword.

In the absence of any direct evidence that Clement gave Arbib the names of prominent DDT defenders, knowing they would be pilloried as paid liars in the *New York Times*, the appellees vigorously urge that Clement's letter of August 14 in effect ratified the charges. But, although by this missive Clement demonstrated himself quite content to have called the appellees liars, he never intimated that the appellees were corrupt. Since this accusation of venality alone was defamatory, Clement's letter to the editor—never published—simply does not tend to establish its author's responsibility for the libelous statement appearing in Devlin's article.[6]

## V.

■ We do not underestimate the pain and distress which the publication of the Audubon Society's thoughtless charges has caused the appellees. And we are fully aware that, in Professor Emerson's words,[7]

A member of a civilized society should have some measure of protection against unwarranted attack upon his honor, his dignity and his standing in the community.

Our holding today does not in any way condone the mischievous and unwarranted assault on the good name of the appellees, who appear from their writings to have entered the lists in favor of DDT in good faith and from humanitarian motives that ought to be beyond reproach.

Nevertheless, we believe that the interest of a public figure in the purity of his reputation cannot be allowed to obstruct that vital pulse of ideas and intelligence on which an informed and self-governing people depend. It is unfortunate that the exercise of liberties so precious as freedom of speech and of the press may sometimes do harm that the state is powerless to recompense: but this is the price that must be paid for the blessings of a democratic way of life.

We believe that the *New York Times* cannot, consistently with the First Amendment, be afflicted with a libel judgment for the accurate reporting of newsworthy accusations made by a responsible and well-noted organization like the National Audubon Society. And, we are convinced that Roland Clement cannot be found liable for a defamatory statement which, as far as this record reveals, he never made. According-

**6.** At trial the appellees called Victor Yannacone, Jr., who testified that Clement was present, some years earlier, at meetings of the Environmental Defense Fund where "smearing" proponents of DDT in the press was discussed. This testimony was contradicted by Dr. Charles Wurzer, another alleged participant in these meetings, and there was no evidence that any "smearings" actually occurred.

We believe the vague and dated testimony of Yannacone does not, in any way, support the inference that Clement ever accused the appellees falsely of corruption.

**7.** T. Emerson, *Toward a General Theory of the First Amendment* 69 (Vintage 1967).

ly, we reverse the judgments against the *Times* and Clement and dismiss the appellees' complaint.