**KITCO, INC., and Rhett W. Burgess, Appellants–Plaintiffs,**

v.

**CORPORATION FOR GENERAL TRADE, d/b/a WKJG–TV 33; Bryan Garner; and Karen Frankola, Appellees–Defendants.**

No. 02A03–9806–CV–258.

Court of Appeals of Indiana.

March 5, 1999.

582

Dane L. Tubergen, Brian L. England, Hunt Suedhoff, Fort Wayne, Indiana, Attorneys for Appellants.

Daniel P. Byron, Steven D. Hardin, McHale Cook & Welch, Indianapolis, Indiana, Charles W. McNagny, Fort Wayne, Indiana, Attorneys for Appellees.

## OPINION

BAILEY, Judge

### Case Summary

Appellant–Plaintiff Kitco, Inc. ("Kitco") appeals from the trial court's grant of summary judgment in favor of Corporation for General Trade D/B/A WKJG–TV 33 ("WKJG"). Appellant–Plaintiff Rhett Burgess ("Burgess") also appeals the trial court's granting of WKJG's Motion to Dismiss, made pursuant to Indiana Trial Rule 12(B)(6). Both Kitco and Burgess (collectively "Plaintiffs") claim that the trial court erred in determining that they presented no issues of material fact and that WKJG was therefore entitled to judgment as a matter of law in this defamation action.

We affirm.

### Issue

Plaintiffs raise numerous issues for our review; however, we find the following issue dispositive: Whether the evidence was sufficient to show that WKJG acted with actual malice when it broadcast the allegedly defamatory news story.

### Facts

The facts most favorable to Plaintiffs, the non-moving parties, reveal that Kitco operates a factory in Bluffton, Indiana, where workers turn hot molten rubber into various automobile parts. During the summer of 1995, there was a heat wave which made the plant, which was not air-conditioned, a hot and sweaty place to work. On August 15, 1995, Burgess, the Chief Executive Officer ("CEO") of Kitco, was approached by the plant manager who stated that he needed to see Burgess on a personnel matter. The plant manager informed Burgess that five third-shift employees had walked out of the

Bluffton plant the night before in protest of not receiving an extended lunch break. Burgess was also informed that when each of the employees left the plant, they complained of the heat. Based on this information, Burgess prepared a "Notice of Termination" directed to each of the five employees and instructed the plant manager to serve the employees with the termination notice upon their return to work, unless the employee produced a doctor's verification that upon leaving the plant they had sought immediate medical treatment for any illness. In such a case, some lesser discipline would be imposed for violating the mandatory safety procedures regarding heat stress treatment.

After leaving the plant on August 15, none of the five workers immediately sought medical treatment. The earliest any of the employees received medical attention was when Ken West ("West") saw his doctor on the morning of August 16, approximately thirty hours after he left the plant. West had called for an appointment the day before, but no appointments were available.

On August 17, 1995, Burgess received a telephone call from Karen Frankola ("Frankola"), the news director at WKJG. Frankola informed Burgess that West had called the news station's hotline and had made a charge that Kitco was working its employees excessive overtime hours in the heat; and, when people became sick from the heat, Kitco was firing them. Burgess denied the charges and also denied that the workers had left due to illness. Burgess then explained to Frankola that the third-shift employees had been terminated because they had engaged in a walk-out in protest over not having received an extended lunch break. Burgess and Frankola also discussed what measures Kitco was taking to protect its workers during the extremely hot conditions, including allowing extended lunch breaks when deemed appropriate by the shift leaders, providing popsicles for the workers, and allowing workers to rest in an air-conditioned office if they felt sick. Also during this conversation, Burgess invited Frankola and other WKJG representatives to come to the Kitco plant and to speak with any of the employees or management personnel and to review its personnel files, policies and procedures.

Frankola called West back and repeated what Burgess had told her. West emphatically maintained that he had left work early because he was sick. Frankola then called Burgess back and stated that WKJG would like to accept his offer to visit the plant and wanted to interview him on air. However, when Burgess declined to be interviewed on camera and stated that he would not allow any photography inside the plant, Frankola decided not to visit the plant. Frankola explained this decision stating that because television was a visual medium, she saw little value in Burgess' offer for her to tour the plant and that she had all the information she needed from her telephone conversations with Burgess.

Later that same day, Frankola met with news reporter Bryan Garner ("Garner") and related to him her conversations with Burgess and West. She then instructed Garner to travel to Bluffton, Indiana, with a cameraman, to interview and tape the five terminated employees. During his interview with the employees, Garner learned of the unbearable heat inside the factory during the summer heat wave. The workers described the work inside the factory as working inside a "hell hole," a "hole," and a "s—— hole." However, the workers did not use the term "sweat shop" to describe the factory.

West told Garner that the temperature inside the plant could reach as high as 120 degrees and noted that the temperature can exceed 350 degrees over the hot molds. Additionally, each of the workers stated that they had left work due to sickness, which had either been caused or exacerbated by the extreme heat. Specifically, West described that he had been nauseous, that his face was extremely red, that he had been sweating profusely, that he had felt light-headed, that he had vomited earlier in the evening, and that he had suffered from diarrhea. West also stated that his condition had gotten much worse because of the extreme heat inside the factory. West was the only employee who had a doctor's note and he faxed Garner a copy of the note before WKJG's first broadcast.

Wesley Nally ("Nally") told Garner that he had been to the hospital the night before. Nally claimed that it had been unbearably hot inside the factory on the night he left, that he was exhausted, sweating profusely, sick to his stomach, and felt like he was going to throw up at any time. Nally also told Garner that the heat inside the factory had contributed to his sickness that night and that the heat was starting to overcome him. Nally told Garner that he had gone to the emergency room "last night" because he thought he was dying and that he was suffering from high fever, dehydration, swollen throat, sore muscles and breathing trouble. Garner made no attempts to verify whether or not the other employees sought medical attention except for the doctor's note provided by West.

After Garner interviewed the workers, Garner and Frankola discussed the story again and decided it should be investigated further. Specifically, they decided that they should check to see if the workers had filed a complaint with their union in order to see if there was any corroborating evidence which supported the employees' allegations. They also wanted to check with the Indiana Occupational Safety and Health Administration ("IOSHA"). Garner subsequently contacted the worker's union representative on August 23, 1995, and inquired as to whether the workers had filed a grievance against Kitco. The union representative confirmed that the workers were pursuing their complaint through the grievance procedure and that a hearing was scheduled for September 12, 1995. Garner also contacted IOSHA to determine whether any regulation existed regarding extreme heat inside factories. Garner was told that no such regulation existed.

On the morning of August 28, 1995, Garner called Burgess to inform him that WKJG was going to air the story and to ask him if he had any additional comments. Garner was told that Burgess could not come to the phone because he was in a meeting, and so Garner left his name and telephone number, as well as a message that WKJG was going to air the story and that he wanted to know if Burgess had any comment. Garner did not receive a return phone call from Burgess, or any Kitco representative.

On August 28, 1995, during its six o'clock evening news, WKJG broadcast a story regarding the termination of the five Kitco employees. WKJG reported a shorter version of the same story during its eleven o'clock news on that same evening, and twice more on the following day. The text of the original news story, broadcast at six o'clock, was, in pertinent part, as follows:

[Anchorwoman Linda Jackson:]

The heat that we've been putting up with for the last few months has been unbearable. The Big Story tonight. .[.] Factory workers in Bluffton say their jobs are making them sick ... and now management is trying to get rid of them....

It's been a sweltering summer for all of us. .[.] but imagine working in a factory that's not air conditioned ... where temperatures reach as high as 120 degrees.

Some workers at a Bluffton company say those conditions forced them to walk off their jobs. .[.] and now the company's retaliated by firing them....

Bryan Garner joins us now with a story you'll see only on the Newswatch. Bryan?

[Reporter Bryan Garner:]

Linda, five employees of the Kitco company are fighting for their jobs tonight.

They say they work in a sweat shop where the heat is unbearable. .[.] while management says it's doing everything it can to keep workers healthy....

[Quote from Kitco Employee Ken West:]

"Everyone was sweating and there was [sic] people outside vomiting ... I don't know what they expect, if they want one of us to drop off ..."

[Garner:]

... For nearly fourteen years, Kenneth West has devoted his life to Kitco. .[.] pressing molten rubber....

[Quote from West:]

"Your molds run 350–380 degrees ... [.] It raises your heat index up to 20 degrees. You're standing there sweating and they want perfect parts."

Two weeks ago, while working on the line, West and four coworkers became nauseous and faint from extreme heat.

[Kitco Employee Wes Nally:]

"I explained to my foreman that I was being pushed too far and the heat was starting to overcome me, I didn't feel well."

They left work, some of them heading straight for the hospital. When they returned to Kitco the next day, they found this . . . [Termination notice is briefly displayed on screen] a termination notice.

> [Full screen text listing charges]
> — Insubordination
> — Providing False Information
> — Walking Off The Job

Charging each of them with insubordination, providing false information, and walking off the job.

While management wouldn't agree to an on camera interview, the company's president said all the workers needed to do was return to work with a doctor's note to be excused.

[Quote from West:]

"I went in last night with my doctor's slip and they threw it in my face and said here, you were terminated."

[Kitco Employee Julia Biberstein:]

"I've lived my life there, you know because I'm 40 now . . . it's really upsetting the way they treat you because of all this time . . . [.]"

[Garner:]

Workers filed a complaint with their union . . . and they contacted the state's health and safety association [sic]. But there are no rules regulating temperatures in factories. And Linda, the company tells us it's done everything possible to keep workers cool and healthy . . . Extending lunch breaks . . . and spending thousands of dollars a month on popsicles.

[Linda Jackson:]

So Bryan, What's next?

[Garner:]

Linda, though the workers were fired two weeks ago, the termination doesn't take effect until September 15 . . . three days after a scheduled hearing between the union and the company.

[Linda Jackson:]

O.K., Thanks Bryan. We'll be sure to keep up with this story.

(R. 302–04, 692–95).

At the time of the broadcast, Garner and Frankola believed that each factual statement in the news story was true and that every opinion expressed was a fair and accurate report of the opinions expressed by the people interviewed.

After the story aired, Kitco sent a retraction demand to WKJG. One of Kitco's complaints involved the statement that some of the workers went straight to the hospital after leaving work. Another complaint was WKJG's use of the term "sweat shop" when referring to Kitco. Kitco explained that the use of such a term improperly suggested that Kitco paid its workers low wages or made them work long hours.

In response to Kitco's letter, WKJG aired a follow-up report wherein Garner, who had realized that he mistakenly thought that Nally had gone straight to the hospital, clarified that the soonest any of the workers went to the hospital was the day after leaving work. Specifically, Garner reported, "Linda, we want to correct an inaccuracy in our original story. We reported some of the workers went straight to the hospital after leaving work that night. To be accurate, the soonest anyone went was the day after leaving work. . . ." (R. 311). Additionally, Garner clarified that "Also, in the first story, we said workers were calling Kitco a 'sweat shop.' In reporting that word we did not mean to imply the company pays low wages and works employees long hours. The reference was to the extremely hot temperatures in the plant. . . ." (R. 290, 311).

### Procedural History

Kitco and Burgess commenced the present action on November 17, 1995. Some discovery followed and amendments were made to the original pleadings. On November 7, 1996, WKJG filed a motion to dismiss pursuant to Indiana Trial Rule 12(B)(6). Following a hearing held on April 28, 1997, the trial

court issued its ruling on June 3, 1997, denying the motion as to the claims of plaintiff Kitco, and granting the motion as to the claims of plaintiff Burgess.

On June 26, 1997, WKJG filed its Petition to Certify Order for Interlocutory Appeal for the purpose of appealing the trial court's denial of its Motion to Dismiss the claims of Kitco. On July 28, 1997, the trial court entered an order certifying for interlocutory appeal that part of its June 3 order denying the Motion to Dismiss Claims of Kitco. On August 1, 1997, Burgess filed his Petition To Certify Order for Interlocutory Appeal regarding the trial court's ruling dismissing his claims. The trial court certified Burgess's motion for interlocutory appeal by order on the same day. This Court denied both petitions for the Court of Appeals to entertain jurisdiction pursuant to Appellate Rule 4(B)(6).

On October 31, 1997, WKJG filed its Motion for Summary Judgment and Designation of Evidence in Support Thereof. Kitco subsequently filed its brief in opposition to WKJG's motion for summary judgment. On February 11, 1998, the trial court granted summary judgment to WKJG on all counts pursuant to written order. The following appeal ensued.

## Discussion and Decision

### Standard of Review

Initially, we note our standard of review. The purpose of a summary judgment is to terminate litigation about which there can be no factual dispute and thus may be determined as a matter of law. *Mayfield v. Continental Rehabilitation Hosp. of Terre Haute*, 690 N.E.2d 738, 740 (Ind.Ct.App.1998), *trans. denied*; Trial Rule 56(C). In determining the propriety of a summary judgment, the trial court must accept as true all the facts which support the non-moving party and resolve all doubts in his favor. *Chester v. Indianapolis Newspapers, Inc.*, 553 N.E.2d 137, 138 (Ind.Ct.App.1990), *trans. denied*. Once the movant presents pleadings, depositions, answers to interrogatories, admissions or affidavits showing he or she is entitled to summary judgment, the non-movant cannot rest on his pleadings, but must set forth specific facts establishing a genuine issue of material fact. *Town of Montezuma v. Downs*, 685 N.E.2d 108, 111 (Ind.Ct.App. 1997), *trans. denied*. The failure to establish a disputed issue of material fact will result in the grant of summary judgment, provided the movant is entitled to judgment as a matter of law. *Id.* at 111–12.

When reviewing a motion for summary judgment, we stand in the shoes of the trial court, applying the same standard utilized by the trial court. *Howell v. Indiana–American Water Co., Inc.*, 668 N.E.2d 1272, 1274 (Ind.Ct.App.1996), *trans. denied*. Thus, we do not weigh evidence, but will consider the facts in the light most favorable to the non-moving party. *Reed v. Luzny*, 627 N.E.2d 1362, 1363 (Ind.Ct.App.1994), *trans. denied*. Additionally, we resolve any doubt as to fact, or an inference to be drawn therefrom, in favor of the party opposing summary judgment. *Howell*, 668 N.E.2d at 1274.

■ Notwithstanding this standard, however, the burden to show reversible error on appeal is on the appellant, and we indulge all reasonable presumptions in favor of the trial court. *Chester*, 553 N.E.2d at 138. When a movant for summary judgment presents evidence which negates an element of the plaintiff's cause of action, and there is a prima facie showing in this evidence, the burden shifts to the plaintiff to demonstrate the existence of a genuine factual issue. *Id.* at 141. If the plaintiff does not show the existence of a factual issue, the entire action will fail. *Id.*

■ Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff. *Kolczynski v. Maxton Motors, Inc.*, 538 N.E.2d 275, 276 (Ind.Ct. App.1989), *trans. denied*. In order to recover in an action for defamation, that which caused the alleged defamation must be both false and defamatory. *Id.* Moreover, a plaintiff must establish the basic elements of defamation, which are as follows: (1) a communication with a defamatory imputation, (2) maliciousness, (3) publication, and (4) damages. *Furno v. Citizens Ins. Co. of America*, 590 N.E.2d 1137, 1141 (Ind.Ct.App.1992), *trans. denied*.

■ Indiana law requires a private individual who brings a defamation action involving an event of general interest to prove "actual malice." *Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 372 N.E.2d 1211, 1218 (1978). A defamatory falsehood is made with "actual malice" where "the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of whether it was false." *AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580, 586 (1974), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976).[1] Publications are made with "reckless disregard" of the truth when the publisher has a high degree of awareness of their probable falsity. *Indianapolis Newspapers, Inc. v. Fields*, 254 Ind. 219, 259 N.E.2d 651, 661 (1970), *cert. denied*, 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190. Thus, "[r]eckless disregard" of a statement's probable falsity is not determined by considering whether a reasonably prudent man would have published or would have investigated before publishing. *Cochran*, 372 N.E.2d at 1219. Rather, in order to prove that a defendant published with reckless disregard, there must be sufficient evidence to permit the conclusion that the defendant (here WKJG) in fact entertained serious doubts as to the truth of his publication. *AAFCO*, 321 N.E.2d at 585. We note, however, that while this standard is clearly a subjective one, "[t]he defendant in a defamation action ... cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Further, whether a statement is reasonably susceptible to a defamatory inference is, in the first instance, an issue of law for the court to decide. *Heeb v. Smith*, 613 N.E.2d 416, 423 (Ind.Ct.App.1993), *trans. denied.*

## I. Kitco's Claim of Defamation

### Argument and Analysis—Actual Malice

Kitco raises numerous issues for our review. However, we address the sole issue of whether the evidence was sufficient to demonstrate that WKJG broadcast its news report with actual malice. We conclude the evidence was insufficient.

Kitco argues that the entry for summary judgment in favor of WKJG was erroneous. Specifically, Kitco argues that the evidence it designated in opposition to WKJG's Motion for Summary Judgment presents sufficient facts such that a jury could reasonably find, with convincing clarity, that WKJG both knew its story was false and also published its news story with reckless disregard of whether or not it was false. (Appellant Kitco's brief at 28). Thus, its argument continues, there exists a genuine issue of material fact regarding whether WKJG acted with actual malice and WKJG was therefore not entitled to summary judgment.

WKJG counters that no evidence was designated to the trial court which could, under the foregoing standard of review, support a finding that it had actual knowledge of the falsity of the implications, if any, of its news story or that it acted with reckless disregard of the truth in publishing the statements herein complained of. We agree with WKJG.

### A. Alleged Direct Evidence of Actual Malice

■ In support of its argument that WKJG acted with actual malice, Kitco directs our attention to the following direct evidence: (1) that despite the fact that Burgess denied the employees' allegations that Kitco had forced its employees to work excessive overtime hours in extreme heat and then fired

[1]. There currently exists a disagreement among the panels of this Court with respect to whether a heightened evidentiary standard must be taken into account at the summary judgment stage of the proceedings. In *Chester*, 553 N.E.2d at 140–41, the court held that a plaintiff need not meet the heightened standard of proving actual malice by clear and convincing evidence in order to survive a summary judgment even though that standard must be met at trial. However, in *Heeb v. Smith*, 613 N.E.2d 416, 420 (Ind.Ct.App.1993), *trans. denied*, the court suggested that the modern approach is that a court must take the heightened standard of proof into account when ruling on a motion for summary judgment, particularly with respect to a media defendant. Because we find no evidence of actual malice, we need not address this conflict today.

them when they became sick, and despite the fact that Burgess further explained to Frankola that the affected employees were terminated for participating in an illegal walk-out, the broadcasts stated that the employees were terminated in retaliation for leaving work to find medical help, (2) that even though Garner was told by the terminated employees that they were sick before arriving at work on the night in question, Garner reported that it was the employees' working conditions which made them sick and that each of the employees had become faint and nauseous from the heat, and (3) that Garner knowingly and falsely reported that the employees left work in order to seek medical help.

Burgess' denial of the employees' allegations does not automatically make their claims untrue, nor does his denial prove, as a matter of law, that the broadcasts were made with actual malice. *See Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120–21 (2nd Cir.1977) (holding that because denials are so commonplace, they, in themselves, hardly alert the conscientious reporter to the likelihood of error and therefore the publication of a statement made in the face of a plaintiff's denial does not constitute actual malice), *cert. denied, Edwards v. New York Times Co.*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

Further, while the record reveals that Burgess informed Frankola that he terminated the employees because they participated in an illegal walk-out, the evidence also shows that when Frankola confronted West on the telephone and informed him of Burgess' allegations, West emphatically insisted that he had left work early due to illness. Moreover, the evidence shows that when Garner interviewed the employees, all five employees gave detailed descriptions of the unbearable heat at the Bluffton factory and all five employees informed Garner that their sickness was either caused or exacerbated by the extreme heat in the factory. Thus, Frankola and Garner were faced with contradictory stories regarding why the employees were terminated; and, Kitco has failed to show this Court how WKJG's decision to believe

the employees' version amounts to actual malice.

Prior to televising the news story, Garner telephoned the employees' union representative who verified that the terminated employees had filed a grievance against Kitco and that a hearing was scheduled for September 12, 1995. Garner also telephoned Burgess in the morning to inform him of his intent to televise the story on the evening news later the same day and to request any further comments from Burgess on behalf of Kitco. However, Burgess was unavailable to take Garner's telephone call; and, neither Burgess, nor any other Kitco representative, ever returned his call. Finally, we note the undisputed fact that during its news reports, WKJG reported that Kitco management said it was doing everything it could to keep workers healthy and cool, including extending lunch breaks and spending thousands of dollars a month on popsicles.

 While Kitco argues that WKJG should have investigated the employees' allegations more thoroughly, this alleged failure on the part of WKJG, in and of itself, is insufficient to create a genuine issue of material fact regarding whether WKJG knowingly published false information or acted with reckless disregard for the truth. The failure to investigate does not, in itself, establish bad faith. *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323.

Finally, while the original broadcast contained statements that the employees left work to seek immediate medical help, and this fact was later determined to be inaccurate, the evidence shows that Garner originally believed that it was true. Additionally, upon learning that the statements were misleading, if not false, Garner clarified the issue during a follow-up news report in which he stated that there was an inaccuracy in the original story and that the soonest any one of the terminated employees went to the doctor was the day after leaving work. These actions further demonstrate that WKJG did not act with actual malice. *See Washington National Ins. Co. v. Administrators*, 2 F.3d 192, 196 (7th Cir.1993) (holding that subsequent statements negating defamatory implications rebuts an inference of

malice by demonstrating that the speaker did not contemplate the defamatory reading in the first place).

Based on the foregoing, our review of the evidence in a light most favorable to Kitco reveals that while WKJG may not have investigated the story as thoroughly as Kitco may have wished, and while some of the statements made were misleading, there is not sufficient evidence to demonstrate that WKJG had knowledge that its story was false or that WKJG entertained serious doubts as to the truth of its story. Even assuming that the impression conveyed by the news broadcasts was false, we find no evidence in the designated materials that WKJG acted with malice in publishing its story or that it entertained serious doubts as to the truth of its publication. *See AAFCO*, 162 Ind.App. 671, 321 N.E.2d 580 (affirming the trial court's grant of summary judgment on appeal even though the articles conveyed a false impression of the plaintiff because there was no evidence that the newspaper acted with malice). Because we do not find any direct evidence of actual malice, we must look to see if there was sufficient circumstantial evidence to support Kitco's allegation of actual malice.

### B. Alleged Circumstantial Evidence of Actual Malice

■ Oftentimes, there is no one specific circumstantial fact which, standing alone, will be sufficient to prove actual malice. However, "while courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Accordingly, Kitco points to several facts in support of its allegation that there exists sufficient circumstantial evidence for a jury to reasonably infer that WKJG acted with actual malice, including: (1) that WKJG failed to adequately investigate, (2) that WKJG failed to take Burgess up on his offer to visit the plant and talk with other employees and to review the personnel records and procedures, and (3) that Garner used the derogatory term

"sweat shop" to describe the working conditions at Kitco's plant.

Our review of the record leaves us convinced that this evidence was insufficient to establish that Kitco acted with actual malice. As stated previously, the fact that WKJG did not investigate the story in the same manner in which Kitco wanted does not prove WKJG acted with malice. Additionally, during the follow-up news report, Garner publicly clarified that when he used the term "sweat shop" in his earlier report, he was using the term literally in reference to the extreme heat and did not mean to imply that Kitco paid its employees low wages or that it worked its employees long hours.

■ To establish recklessness, it is not sufficient to show that the reporting in question was speculative or even sloppy. *Cochran*, 372 N.E.2d at 1220. In fact, evidence of an extreme departure from professional journalistic standards, without more, cannot provide a sufficient basis for finding actual malice. *Harte–Hanks Communications*, 491 U.S. at 665, 109 S.Ct. 2678. "If a genuine issue of material fact concerning a publisher's reckless disregard for the truth could be raised by a mere showing that the published speech was factually incorrect, the constitutional policy of avoiding media self-censorship would be seriously eroded." *AAFCO*, 321 N.E.2d at 591. Based on the foregoing, we find that there was insufficient circumstantial evidence presented to create a genuine issue of material fact as to whether WKJG acted with actual malice.

### II. Burgess' Claim of Defamation

Burgess argues that the trial court erred in dismissing his claim pursuant to Indiana Trial Rule 12(B)(6).

■ A motion to dismiss under T.R. 12(B)(6) tests the legal sufficiency of the claim, not the facts which support it. *Vakos v. Travelers Ins.*, 691 N.E.2d 499, 501 (Ind. Ct.App.1998), *trans. denied.* Thus, on review, we consider the pleadings in the light most favorable to the non-moving party (here Burgess) and we draw every reasonable inference in favor of that party. *Id.* A dismissal under T.R. 12(B)(6) is improper unless it

appears to a certainty that the plaintiff would not be entitled to relief under any set of facts. *Thomson Consumer Electronics, Inc. v. Wabash Valley Refuse Removal, Inc.*, 682 N.E.2d 792, 793 (Ind.1997).

In reviewing the pleadings in the light most favorable to Burgess and drawing every reasonable inference in his favor, we conclude that under the facts alleged, dismissal of Burgess' complaint under T.R. 12(B)(6) was error. However, no error in any ruling by the trial court is ground for granting relief unless it appears to be inconsistent with substantial justice. T.R. 61.

In examining Burgess' defamation claim as a private individual, we employ the same analysis as that used to evaluate Kitco's claim as a public entity. *See AAFCO*, 321 N.E.2d at 586 (holding that a private individual who brings a defamation action involving an event of general public interest must prove that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of whether it was false).

 The alleged defamatory statements Burgess relies upon in support of his contention that he was personally defamed are the same statements which Kitco relied upon, namely, that "Kitco forced its workers to labor in blistering hot conditions and then, when the heat made them sick and they were forced to leave work to seek medical help, the Company retaliated by firing them." (Appellant Burgess' brief at 7). Burgess further asserts that "naturally, a corporation acts only through its individual representatives" and, thus, the references to "management" and Kitco's "CEO," coupled with the termination notice which was briefly displayed during the broadcast, necessarily made Burgess a "specific target" of WKJG's alleged defamatory conduct. (Appellant Burgess' brief at 8). Additionally, Burgess contends that, as Kitco's CEO, he stands in such a close relationship to Kitco (and/or "Kitco Management") that defamation of either would be found to reflect upon the reputation of the other. (Appellant Burgess' brief at 4).

Assuming, without conceding, that this argument were true, it would follow, then, that a finding that no actual malice on the part of WKJG towards Kitco would also indicate no actual malice on the part of WKJG towards Burgess. As we have previously determined, WKJG did not act with actual malice when it published its news story. And, for the same reasons set forth above in part I, because WKJG did not broadcast its news story with actual malice, Burgess' separate claim of defamation would also fail. Thus, whether Burgess was a "specific target" of WKJG's news story does not change the fact that Burgess would be unable to establish an issue of material fact regarding whether WKJG acted with actual malice in publishing its news story. Consequently, while it was error for the trial court to dismiss Burgess' claim under T.R. 12(B)(6), and while it may have been more appropriate for the trial court to deny the 12(B)(6) motion to dismiss and subsequently consider the matter under T.R. 56, further analysis reveals that the error did not affect Burgess' substantial rights. In effect, the error was harmless.

## III. Conclusion

While Kitco and Burgess each maintain that the statements contained in WKJG's news broadcasts demonstrated the presence of actual malice, we find the record reflects otherwise. The basis of the Plaintiffs' complaints are that the broadcasts did not convey a favorable impression of either Kitco or Burgess, that WKJG failed to fully investigate the story, and that in referring to the Kitco factory as a "sweat shop," WKJG implied that Kitco and Burgess were "heartless" and "cruel" and that they were "Neo–Nazi slave shop operators" who care little about the welfare of their employees and who fired the workers because they left work to seek medical help. (Appellants' reply brief at 10; Appellant Burgess' brief at 7).

The alleged omissions or defamatory acts committed by WKJG at most might arguably constitute negligence. However, negligence or failure to investigate is not sufficient to establish actual malice. *Chester*, 553 N.E.2d at 140. Thus, even if the Plaintiffs were to prove that WKJG acted negligently by misconstruing the employee's statements or by failing to fully investigate, such proof would

fall short of the constitutional requirement of proving actual malice.

The Plaintiffs bore the burden of demonstrating that WKJG published a falsehood with knowledge of its falsity or acted with reckless disregard for the truth. However, our review of the record leaves us convinced that the plaintiffs failed to sustain that burden. Even upon consideration of all the designated evidence in a light most favorable to Kitco and Burgess, we cannot conclude that there was sufficient evidence to demonstrate that WKJG knew or in fact entertained serious doubts as to the truth of the statements contained in its news story. Moreover, this is not a case where there was no support whatsoever for the allegedly misleading statements. Nor was the news story so inherently improbable that only a reckless person would have published it. It is undisputed that the temperature inside the factory could reach as high as 120 degrees. Additionally, the evidence reveals that all five employees told Garner that they left work due to illness which was either caused or exacerbated by the extreme heat in the factory. Further, the union representative informed Garner that the employees had filed a grievance challenging their termination. This evidence supports WKJG's contention that it believed the employees' allegations when it broadcast its news story and that it acted in good faith in doing so.

 While some of the statements contained in the news story were arguably misleading, the statements complained of herein do not constitute actual malice. In the area of free speech, such cases are to be anticipated. "[E]rroneous statement[s][are] inevitable in free debate, and ... must be protected if the freedoms of expression are to have the breathing space that they need ... to survive." *New York Times Co. v. Sullivan*, 376 U.S. 254, 271–272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (citations and quotations omitted). Based on our conclusion that there was no evidence of actual malice in WKJG's news report, we hold that the trial court's entry of summary judgment in favor of

WKJG and its dismissal of Burgess' claim pursuant to T.R. 12(B)(6) was proper.

Affirmed.

NAJAM, J., and SHARPNACK, C.J., concur.