**NORTHERN INDIANA PUBLIC SERVICE COMPANY,**
Appellant–Defendant,

v.

**Hassan K. DABAGIA, Appellee–Plaintiff.**

No. 46A03–9802–CV–51.

Court of Appeals of Indiana.

Dec. 27, 1999.

Rehearing Denied Feb. 22, 2000.

Paul Rake, Sherry L. Clarke, Eichhorn & Eichhorn, Hammond, Indiana, Attorneys for Appellant.

Jay Lauer, South Bend, Indiana, Shaw R. Friedman, LaPorte, Indiana, Todd R. Richardson, Lewis & Kappes, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SHARPNACK, Chief Judge

Northern Indiana Public Service Company ("NIPSCO") appeals a judgment in favor of Hassan Dabagia on his claims for defamation and breach of an implied covenant of good faith and fair dealing. NIP-

SCO raises the following issues that we consolidate and restate as:

1) Whether the trial court erred when it denied NIPSCO's motion for summary judgment on Dabagia's claim for breach of an implied covenant of good faith and fair dealing;

2) Whether the trial court erred when it denied NIPSCO's motion for summary judgment on one of Dabagia's claims for defamation; and

3) Whether the trial court erred when it entered judgment for Dabagia on his other claims for defamation.

We reverse and remand.

The relevant facts follow. NIPSCO is a public utility company that furnishes gas and electric services to customers in northern Indiana. Dabagia was employed by NIPSCO from June 1, 1981, until he was fired on April 28, 1994. Dabagia worked for NIPSCO in a number of positions, but at the time of his discharge he was a sales representative. His responsibilities included contacting NIPSCO customers, assessing their gas and electric needs, and suggesting the installation of new equipment which would increase the customers' energy efficiency.

In 1992, NIPSCO began a sales incentives program to generate greater electrical and gas revenues. Sales representatives who participated in the program negotiated with their supervisors annually to set monetary goals for the amount of sales events they would generate during the year. A sales event occurred when a customer notified NIPSCO that it wanted to add new equipment or modify existing equipment, thereby resulting in an increase in the customer's energy usage. The salesperson would then record the information provided by the customer on a sales event form. Salespersons participating in the sales incentive program were required to perform extra work in addition to their normal duties. If a salesperson met or exceeded his or her monetary goal for the year, then he or she would receive a percentage of NIPSCO's projected new income from the customer's increased energy usage as a bonus.

In 1993, Dabagia negotiated a sales incentive agreement with his supervisor in which he set a sales goal of $650,000, the highest goal among all NIPSCO sales representatives in his district. Dabagia completed 133 sales event forms for the program in 1993, and he exceeded his sales goal for the year. As a result, he earned $72,072.72 in incentive pay and a quarterly bonus of $3,315 from the program in addition to his base salary.

In early 1994, NIPSCO's management discovered a discrepancy between the projected increased energy usage reported during the 1993 sales incentive program and actual energy usage. NIPSCO's internal audit department began a review of the 1993 incentive sales program to identify the causes of the discrepancy. NIPSCO auditors Ed Stood and Jim Cook called approximately 100 of the customers who had participated in the 1993 sales program and asked them if equipment had actually been installed or modified as described on their sales event forms. During the course of the audit, the auditors determined that eight of Dabagia's 1993 sales event forms projected extra energy usage by the customers, but the extra energy usage never occurred. On each of the eight forms, Dabagia claimed that the customer had installed new equipment which would result in increased energy usage. In each case, however, the equipment was not installed as described on the form, and the equipment had either never been installed or had been installed years before Dabagia contacted the customer.

The auditors contacted Dabagia in late March 1994 and scheduled a meeting with him to discuss the audit. Dabagia met with Ed Stood and David Vajda, both NIPSCO auditors, on April 6, 1994. They questioned Dabagia about his job and his perceptions of the 1993 sales event program. Vajda and Stood then asked Daba-

gia about each of the eight sales event forms and told him that all of the forms contained inaccurate information about equipment installation. Dabagia stated that he had relied on the customers' assertions that the work was going to be done when he filled out the forms.

A second meeting took place on April 28, 1994. Dabagia, Vajda, and Stood were present, as were John Higley, who was NIPSCO's Director of Marketing, and Ronald Wilder, an attorney representing NIPSCO. Dabagia was again questioned about the eight sales event forms. Dabagia insisted that he believed that the information on the forms was correct at the time he recorded it, but he also recognized that the forms contained inaccurate information. The officials told Dabagia to resign or be fired. Dabagia refused to resign, and he was suspended from employment at the end of the meeting.

Later that same day, Dabagia returned all of the incentive pay he had earned in 1993. On May 9, 1994, Mark Maassel, a NIPSCO Vice President, met with Dabagia and fired him. On May 23, NIPSCO returned most of Dabagia's 1993 incentive pay. NIPSCO kept $6,745.71 of the bonus money because, according to its calculations, that was the amount of unearned bonus pay that Dabagia had received from the inaccurate sales event forms.

Dabagia filed a complaint on Sept. 13, 1994, alleging breach of an employment contract, breach of an implied covenant of good faith and fair dealing, and defamation. NIPSCO filed a motion for summary judgment on all of Dabagia's claims, and the trial court denied NIPSCO's motion. The trial court also decided that the case would be tried before an advisory jury. Trial was held on June 9–13, 1997. At the close of Dabagia's case, NIPSCO moved for dismissal under Ind. T.R. 41(B) or, in the alternative, judgment on the evidence under Ind. T.R. 50(A). The trial court

denied NIPSCO's motion. The jury returned an advisory verdict for NIPSCO on Dabagia's claim for breach of contract. However, the jury also returned an advisory verdict for Dabagia on his claims for defamation and breach of implied covenant of good faith and fair dealing, and it awarded him $1,877,271.00 in damages.

On July 9, 1997, NIPSCO filed a motion to correct the advisory verdict and a request for findings of fact and conclusions of law. The trial court heard oral argument, and the parties both submitted their proposed findings of fact and conclusions of law on December 18, 1997. The trial court entered judgment on January 9, 1998, in which it adopted the advisory jury verdicts, "except as to the damages," and adopted Dabagia's proposed findings of fact and conclusions of law, again "except as to damages." Record, p. 738. The trial court awarded Dabagia $500,000 for breach of an implied covenant of good faith and fair dealing and $500,000 for defamation.

I.

■ The first issue is whether the trial court erred when it denied NIPSCO's motion for summary judgment on Dabagia's claim for breach of an implied covenant of good faith and fair dealing. NIPSCO contends that Dabagia was an at will employee of NIPSCO and that the sales incentive agreement did not change his employment status. Therefore, NIPSCO claims, no implied covenant was created, and NIPSCO was free to dismiss Dabagia at any time and for any reason.

■ At the outset, we note that although this case proceeded to trial, and the trial court entered final judgment on Dabagia's claims, we may still review the trial court's ruling on NIPSCO's motion for summary judgment. *See Manning v. Allgood,* 412 N.E.2d 811, 817 (Ind.Ct.App. 1980) *trans. denied.*[1]

---

1. NIPSCO does not appeal the trial court's denial of its motion for summary judgment on

Dabagia's claim for breach of contract. Since NIPSCO was successful on this claim at

Next, we set out the standard of review for rulings on summary judgment. The purpose of summary judgment is to terminate litigation about which there is no factual dispute and which may be determined as a matter of law. *Orem v. Ivy Tech State College,* 711 N.E.2d 864, 867 (Ind.Ct.App.1999), *reh'g denied.* When reviewing a grant or denial of summary judgment, this court applies the same standard as does the trial court. *Id.* at 867–868. Summary judgment should be granted only if the designated evidentiary material shows that there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Ind. Trial Rule 56(C); *Orem,* 711 N.E.2d at 868. Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Orem,* 711 N.E.2d at 870. We must consider all the material designated by the parties, including pleadings, affidavits, depositions, admissions, answers to interrogatories, and testimony, in the light most favorable to the nonmoving party. *Heeb v. Smith,* 613 N.E.2d 416, 419–420 (Ind.Ct.App.1993), *trans. denied.* If we have any doubts concerning the existence of a genuine issue of material fact, we must resolve those doubts in favor of the nonmoving party. *Id.* If no genuine issue of material fact exists, summary judgment is appropriate if the moving party is entitled to judgment as a matter of law. *Id.*

Turning to the question of Dabagia's employment status, our supreme court has held that there are two types of employment: (1) employment for a definite or ascertainable term; and (2) employment at will. *Orr v. Westminster Village North, Inc.,* 689 N.E.2d 712, 717 (Ind.1997). If an employment contract contains no definite or ascertainable terms of employment, then the employment agreement is at will and presumptively terminable at any time,

with or without cause, by either party. *Id.* The presumption that an employment arrangement is at will is strong in Indiana. *Id.*

There are three recognized exceptions to the employment at will doctrine. The first occurs when the employee provides adequate independent consideration to the employment contract, thereby establishing that the parties intended to form an employment relationship in which the employee can only be terminated for good cause. *Id.* at 718. The second exception arises when the discharge of an employee violates a clear statutory expression of an employee's right or duty. *Id.* Finally, an employee may invoke the doctrine of promissory estoppel to prevent an employer from firing the employee without good cause, if the employee pleads promissory estoppel with particularity. *Id.* In the instant case, Dabagia has not argued that NIPSCO has violated any of his clearly established statutory rights or duties, and he has not plead promissory estoppel, so our analysis must focus upon whether Dabagia's sales incentive agreement provided adequate independent consideration on his part.

The sales incentive forms signed by Dabagia and his supervisors make no explicit reference to a term of employment. Therefore, Dabagia's employment at NIPSCO was presumptively terminable at any time, with or without cause. *See Orem,* 711 N.E.2d at 870. We must now consider whether Dabagia supplied "adequate independent consideration" in the Agreement to rebut the presumption of employment at will. *Id.*

In *Orem,* an employee and his employer signed an agreement in which the employee agreed to drop his grievances against the employer in exchange for being appointed to a certain position with the employer. *Id.* at 867. When the employee's job was eliminated five years later, he sued

trial, it would serve no useful purpose to review the issue now. *See Morris v. G. Rassel, Inc.,* 576 N.E.2d 596, 598 (Ind.Ct.App.1991)

(stating that it is pointless to review denial of summary judgment when the movant subsequently succeeds on the claim at trial).

the employer, claiming that when he agreed to release his grievances, he provided independent consideration which altered their employment relationship so that he could only be terminated for good cause. *Id.* at 870. We affirmed the trial court's grant of summary judgment in the employer's favor because the evidence showed that the employee had not provided independent consideration. *Id.* at 871. Instead, the employee had only fairly bargained for appointment to a certain job in exchange for releasing his grievances. *Id.*

In the case at bar, Dabagia agreed to accomplish a number of tasks for NIPSCO under the 1993 sales incentive program, including earning $650,000 in additional electric margin for the company. However, Dabagia was compensated in the form of incentive bonuses for all of the extra work he performed. An examination of the materials presented with both parties' briefs at the summary judgment stage reveals no evidence that Dabagia had bargained for job security as compensation for participating in the incentive program. Even viewing the facts in the light most favorable to the nonmovant, there is no evidence of adequate independent consideration which would rebut the presumption of employment at will. Therefore, Dabagia was an at-will employee during 1993 and 1994. *See id.* at 872.

The case cited by Dabagia can be distinguished. In *Weiser v. Godby Brothers, Inc.*, a salesperson sued his former employer, claiming that the employer had fired him in order to avoid paying commissions to him pursuant to the parties' "Sales Compensation Plan." *Weiser v. Godby Brothers, Inc.*, 659 N.E.2d 237, 238 (Ind. Ct.App.1995), *reh'g denied, trans. denied.* The sole issue in that case was whether the employee had a right to his commissions, not whether he could only be fired for good cause, and we specifically noted there that "we are not concerned with the

validity of the termination." *Id.* at 239. Therefore, *Weiser* is inapplicable to this case because it addresses employees' rights to their commissions, not limits upon the employer's right to fire employees at will.

Because, as a matter of law, Dabagia was an employee at will when he was terminated, Dabagia's claim for breach of an implied covenant of good faith and fair dealing must fail. It is undisputed that "Indiana does not recognize such a cause of action in employment at will contexts." *Mehling v. Dubois County Farm Bureau,* 601 N.E.2d 5, 8 (Ind.Ct.App.1992). Therefore, at the summary judgment stage, he could not have prevailed on this claim. *See id.* Because there is no dispute of material fact regarding the absence of independent consideration, and because Dabagia could not have prevailed on his claim for breach of an implied covenant as a matter of law, summary judgment should have been granted to NIPSCO on Dabagia's claim. *See Orem,* 711 N.E.2d at 872. Therefore, we must reverse the judgment of the trial court and remand with instructions to enter summary judgment in favor of NIPSCO on Dabagia's claim for breach of an implied covenant of good faith and fair dealing.

## II.

The next issue is whether the trial court erred when it denied NIPSCO's motion for summary judgment on one of Dabagia's claims for defamation. At the summary judgment stage, Dabagia alleged that NIPSCO Vice President Mark Maassel defamed him at a meeting of NIPSCO employees following his termination. NIPSCO now asserts that it was entitled to summary judgment as a matter of law because the statements were true and Maassel was shielded by a qualified privilege.[2]

2. NIPSCO also alleged that Maassel's statements at the meeting lacked defamatory imputation. NIPSCO has failed to argue or cite to any cases or relevant authority in support of this contention. Ind. Appellate Rule 8.3(A)(7) requires that the appellant support

■ Our standard of review on summary judgment is set forth above, but we add that when the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense which bars the plaintiff's claim. *Rambo v. Cohen,* 587 N.E.2d 140, 145 (Ind.Ct.App.1992), *reh'g denied, trans. denied.*

■ To maintain an action for defamation, a plaintiff must prove a communication with four elements: 1) defamatory imputation; 2) malice; 3) publication; and 4) damages. *Schrader v. Eli Lilly & Co.,* 639 N.E.2d 258, 261 (Ind.1994), *reh'g denied.* Initially, the determination of whether a communication is defamatory is a question of law for the court; it is to be presented to the jury as a question of fact only if the communication is reasonably susceptible to either defamatory or nondefamatory interpretation. *Rambo,* 587 N.E.2d at 145. In making such a determination, the communication is to be viewed in context and given its plain and natural meaning. *Id.* (quoting *Jacobs v. City of Columbus,* 454 N.E.2d 1253, 1264 (Ind.Ct. App.1983), *trans. denied* ). However, not all defamation is actionable. *Van Eaton v. Fink,* 697 N.E.2d 490, 494 (Ind.Ct.App. 1998), *reh'g denied.* True statements never give rise to liability for defamation. *Conwell v. Beatty,* 667 N.E.2d 768, 774 (Ind.Ct.App.1996), *reh'g denied.* This fundamental doctrine is set forth in our state constitution. Ind. Const. Art. 1, § 10 ("In all prosecutions for libel, the truth of the matters alleged to be libellous, may be given in justification.").

In this case, the allegation of defamation at issue arose out of a meeting of NIPSCO sales employees held on May 16, 1994, shortly after Dabagia's termination. NIPSCO Vice–President Mark Maassel told everyone present that "[t]he audit's complete, everything has been satisfied up to this point; however, Hassan Dabagia has been let go." Record, p. 122.

NIPSCO contends that Maassel's statements were not defamatory because they were true. It is undisputed that Mark Maassel had fired Dabagia on May 9, 1994. Furthermore, Dabagia presented no evidence at the summary judgment stage that, at the time Maassel made the statements, the audit was not yet complete. Therefore, Maassel's remarks were true and non-defamatory. *Conwell,* 667 N.E.2d at 774 (holding that a statement by sheriff that a deputy had previously been the subject of a criminal investigation was true and non-defamatory). Dabagia argues that Maassel's announcement implied wrongdoing on his part in the minds of the employees at the meeting and was consequently false by implication. This argument, however, speaks more to the element of defamatory imputation than the affirmative defense of truth. There being no material dispute of fact as to the truth of Maassel's statements, NIPSCO was entitled to summary judgment on this claim of defamation. *See Associates Corp. of N. Am. v. Smithley,* 621 N.E.2d 1116, 1120 (Ind.Ct.App.1993) (holding that summary judgment should have been granted for defendant on plaintiff's claim of defamation because the statement was true). Because there was no defamatory statement here, we do not reach NIPSCO's defense of qualified immunity. *See Conwell,* 667 N.E.2d at 775. Consequently, we reverse the judgment of the trial court and remand with instructions to enter summary judgment in favor of NIPSCO on this claim for defamation.

### III.

The third issue is whether the trial court erred when it entered judgment for Daba-

each contention with an argument, including citations to legal authorities and the record for support. *Choung v. Iemma,* 708 N.E.2d 7, 13 (Ind.Ct.App.1999), *reh'g denied.* Failure to present any argument or citations to authority in support of the defamatory imputation contention constitutes a waiver of the alleged error for appellate review. *See id.*

gia on his other two claims of defamation. We will address each claim in turn.

■ Our standard of review for findings of fact and conclusions thereon is governed by Indiana Trial Rule 52, which provides, "[o]n appeal of claims tried by the court without a jury ..., the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." T.R. 52. In applying this rule, we employ a two-tiered standard of review. *OVRS Acquisition Corp. v. Community Health Serv., Inc.*, 657 N.E.2d 117, 123–124 (Ind.Ct.App.1995), *reh'g denied, trans. denied.* First, we consider whether the evidence supports the findings. *Id.* In determining whether findings are clearly erroneous, we construe the findings liberally in support of the judgment. *Id.* The findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. *Id.* Next, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. *Id.* We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* We must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.* Our discussion of Indiana's defamation law is set forth above.

### A.

■ During the audit of the 1993 incentive program, the auditors contacted NIPSCO customer Marquette Mall and spoke with James Losiniecki, a mall employee who had talked with Dabagia in 1993 about installing new equipment. They told Losiniecki that "they were doing some investigating into Haasen's [sic] work." Record, p. 1194. Losiniecki told the auditor that the equipment had not been installed, and he testified that he felt as if the auditor was "looking for something that [Dabagia] did wrong." Record, p. 1196. The tone of the discussion left Losiniecki with the impression that Dabagia "got caught doing something he wasn't supposed to be doing." Record, p. 1194. NIPSCO argues that the auditor's statement to Losiniecki is not defamatory because it is true.

Dabagia does not contest the truth of the statement, and he has produced no evidence that the auditors contacted Losiniecki for any other reason than to determine if Dabagia's sales event form for Marquette Mall was accurate. Even viewing the record in the light most favorable to the nonmovant, there is no evidence that this statement is false. Therefore, the statement is true and nondefamatory. *See Conwell*, 667 N.E.2d at 774.

■ Dabagia contends that Losiniecki's feelings that the auditor was "looking for something that [Dabagia] did wrong" and that Dabagia "got caught doing something he wasn't supposed to be doing" imputed misconduct to him. Record, pp. 1194, 1196. It is true that Losiniecki's feelings are evidence of imputed misconduct, but his beliefs are irrelevant to the question of whether the auditor's statement is true or false. Dabagia also correctly points out that allegedly defamatory statements must be construed in light of the circumstances of their utterance. However, this point is once again relevant to the issue of imputed misconduct, not the affirmative defense of truth. *See Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind.Ct.App. 1992).[3]

---

3. The cases cited by Dabagia are distinguishable from the one at bar. In *Elliott v. Roach,* we held that there was a factual dispute regarding the defense of truth because there was conflicting evidence of whether a rental agent had acted "falsely" and "dishonestly," as a former tenant had claimed. *Elliott v. Roach*, 409 N.E.2d 661, 681 (Ind.Ct.App. 1980). In this case, there is no dispute that the auditors were, in fact, investigating Dabagia's work, as the auditor asserted. In *Long v. Durnil,* summary judgment was inappropri-

The evidence points incontrovertibly to the conclusion that the auditor's statement was true, and so the statement cannot be defamatory. We do not reach NIPSCO's defense of qualified immunity because there was no defamatory statement here. *See Conwell,* 667 N.E.2d at 775. Because the auditor's statement was nondefamatory, a review of the record has left this court with the firm conviction that a mistake has been made. *See OVRS,* 657 N.E.2d at 123–124. Therefore, we must reverse and remand the judgment of the trial court with instructions that the judgment for Dabagia on this claim of defamation be vacated and judgment entered in favor of NIPSCO.

## B.

■■ We now turn to Dabagia's third claim of defamation. NIPSCO argues that the trial court erred when it concluded that ethnic slurs of Dabagia by a NIPSCO supervisor were defamatory because: 1) there was no defamatory imputation in the remarks, and 2) there is no evidence that the remarks caused special damages to Dabagia. Mary Wellnitz, who was Dabagia's supervisor in early 1994, made both of the remarks at issue. Mark Dranger, a NIPSCO sales engineer, testified that in early 1994 he went to a restaurant with Wellnitz and Mark Maassel, a NIPSCO executive. Dranger heard Wellnitz say, "[w]ell my section ought to win because we've got the camel jockey leading the way." Dranger also testified that he once heard Wellnitz refer to Dabagia as "that Arab."

■■ While racial slurs and epithets are contemptible and do not belong in a civil society, they are generally not defamatory in the absence of particular circumstances that make them so. It would be necessary to show either that the words were intended and understood to be a statement about the subject that was defamatory in itself or that, under the circumstances, lowered the subject in the eyes of the community or deterred others from associating with the subject. *See Rambo,* 587 N.E.2d at 147. For example, if calling Dabagia a "camel jockey" was intended to mean and was understood to mean that he was a "thief," then the statement would be defamatory. However, where it is necessary to prove the defamatory nature of the statement, the defamation is per quod and not per se. In such a case it is necessary to show that special damages were caused by the statement. *See id.* at 145. Damages are not presumed to follow from the statement as is the case in defamation per se. *See id.*

In this case, the only evidence before the trial court was that Wellnitz had referred to Dabagia as a "camel jockey" and "that Arab." Both statements are racist terms which identify Dabagia as an Arab, but that meaning is not by itself defamatory. In the absence of evidence that those phrases had a certain meaning among Wellnitz, Dranger and Maassel, lowered Dabagia's esteem in the eyes of Dranger and Maassel, or deterred Dranger and Maassel from associating with Dabagia, the epithets alone are not actionable. *See*

ate for the defendant on plaintiff's claim of defamation because there was conflicting evidence of whether the plaintiff was indeed a "target[ ] of a grand jury investigation...." *Long v. Durnil,* 697 N.E.2d 100, 105 (Ind.Ct. App.1998), *trans. denied,* 714 N.E.2d 164. In this case, there is no dispute in the record that the NIPSCO auditor's statement to Losiniecki was true. In *Cochran v. Indianapolis Newspapers, Inc.,* we held that summary judgment on the plaintiffs' defamation claims was inappropriate because the defendant newspaper had juxtaposed otherwise true headlines

with otherwise true stories so that a reader could have received the false impression that the plaintiffs were connected with a brothel investigation. *Cochran v. Indianapolis Newspapers, Inc.,* 175 Ind.App. 548, 555–556, 372 N.E.2d 1211, 1218–1219 (Ind.Ct.App.1978). Here, all that was present was a simple statement of fact which was not susceptible to misinterpretation. Finally, truth as an affirmative defense was not an issue in *Owens v. Schoenberger,* 681 N.E.2d 760 (Ind.Ct.App. 1997), *reh'g denied,* and *Street v. Shoe Carnival, Inc.,* 660 N.E.2d 1054, 1058 (Ind.Ct.App. 1996).

*Rambo,* 587 N.E.2d at 147–148 (discussing decisions from other jurisdictions involving racially offensive remarks).

Furthermore, assuming arguendo that Wellnitz's slurs were defamatory per quod, NIPSCO contends that Dabagia failed to show that his damages, namely lost wages and medical bills, were caused by Wellnitz's remarks. A plaintiff pleading special damages due to defamation, whether per quod or per se, must plead and demonstrate that the special damages were "incurred as a natural and proximate consequence of the wrongful act." *Stanley v. Kelley,* 422 N.E.2d 663, 668–669 (Ind.Ct.App.1981), *rejected in part on other grounds by Bochnowski v. Peoples Federal Sav. & Loan Ass'n,* 571 N.E.2d 282, 284 (Ind.1991). In *Stanley,* a director of sales for a corporation who was fired for proselytizing sales representatives sued a former subordinate, alleging that he was actually fired because the subordinate had openly accused him of disloyalty to the corporation. *Id.* at 666. The trial court granted the subordinate's motion to correct errors and motion for judgment on the evidence, and we affirmed the trial court's judgment because the weight of the evidence did not show that the defendant's statement alone proximately caused plaintiff's termination. *Id.* at 669.

In this case, the evidence most favorable to the judgment shows that Wellnitz referred to Dabagia as a "camel jockey" in early 1994 in the presence of NIPSCO Vice President Mark Maassel, who laughed at Wellnitz's remark. There is no evidence in the record to show that Wellnitz's remark was the proximate cause of Dabagia's termination, which took place months later. The trial court found that the remark was a factor in Dabagia's termination and subsequent damages, but there is no evidence in the record to support this finding. Since the evidence does not show that Wellnitz's ethnic slur caused Dabagia's damages, Dabagia's claim of defamation cannot prevail. *See Stanley,* 422 N.E.2d at 669. A review of the record has left us firmly convinced that a mistake has been made because the evidence does not support the findings. *See OVRS,* 657 N.E.2d at 123–124. Therefore, we must reverse the trial court's judgment for Dabagia on this claim of defamation and remand with instructions that judgment should be entered in favor of NIPSCO on this claim.

We find that summary judgment should have been granted in NIPSCO's favor on Dabagia's claim for breach of an implied covenant of good faith and fair dealing and on one of his claims for defamation. Furthermore, NIPSCO was entitled to judgment on Dabagia's other two claims of defamation.

For the reasons stated above, we reverse the judgment of the trial court. We remand with instructions to enter judgment for the defendant.

Reversed.

DARDEN, J. concurs.

ROBB, J. concurs with separate opinion.

ROBB, Judge, concurring

I concur with the majority on all the issues, except that I write separately to address a single element of defamation, defamatory imputation, to determine whether a racial slur[4] or epithet[5] is the type of communication that has the tendency to harm reputation, and thus, is unprotected speech.

Initially, I recognize that the First Amendment to the United States Constitution, incorporated to the states via the Fourteenth Amendment, protects free speech, providing in pertinent part that

---

4. A slur is defined as a "[d]isparaging remark; an aspersion; stigma." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1218 (1981).

5. An epithet is defined as "[a]n abusive or contemptuous word or phrase used to describe a person." *Id.* at 441.

"Congress shall make no law ... abridging the freedom of speech...." Moreover, Article I, Section 9 of the Indiana Constitution protects free speech, providing in pertinent part that "[n]o law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak...." However, the constitutional language contained in these clauses does not permit all types of language or forms of speech.

The Supreme Court of the United States has held that the First Amendment is not absolute, classifying certain types of communication as unprotected speech. The Court has determined that the Constitution of the United States does not protect speech that constitutes fighting words,[6] is obscene,[7] promotes child pornography,[8] or is carelessly or maliciously libelous.[9] The Court has stated that the First Amendment does not protect these categories of speech because they "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). In short, the First Amendment does not protect every conceivable use of language, but only the "communication of ideas" in the broad sense of self-expression directed toward the intellectual/emotional faculties.

In the present case, we are only concerned with that category of unprotected speech known as defamation, which can be legislated by the states individually. *Chaplinsky*, 315 U.S. at 571–72, 62 S.Ct. 766. Defamation is a tort action. *See Long v. Durnil*, 697 N.E.2d 100, 105 (1998), *trans. denied* (observing that the United States Supreme Court has held that defamation is a tort actionable under the laws of most states but is not a constitutional deprivation); *see also Mart v. Hess*, 703 N.E.2d 190, 192 (Ind.Ct.App. 1998) ("In a defamation action, the place of the tort is generally considered the place of publication, i.e., where the defamatory material is communicated to a third party."). The goal of defamation law is to define a realm of socially unreasonable communication, and compensate individuals for the harm to reputation resulting from such communication. A defamatory statement is capable of harming an individual in all areas of his life, social, political, economic, psychological, even physical. Defamation is easily committed and is frequently ineradicable and sinister in effect.

To recover in an action for defamation, that which caused the alleged defamation must be both false and defamatory. *Kitco, Inc. v. Corp. of Gen. Trade*, 706 N.E.2d 581, 587 (Ind.Ct.App.1999). The plaintiff must establish the basic elements of defamation: (1) a communication with a defamatory imputation; (2) publication; and (3) damages. *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind.Ct.App.1992), *trans. denied*. The determination of whether a communication is defamatory is a question of law for the court. *Id.*

A communication may be defamatory per se or per quod. *Rambo*, 587 N.E.2d at 145. In the case of slander, a communication is defamatory per se if it imputes: 1) criminal conduct; 2) a loathsome disease; 3) misconduct in a person's trade, profession, office, or occupation; or 4) sexual misconduct. *Id.*; Restatement (Second) of Torts § 570 (1977). If a communication is defamatory per se, the plaintiff is entitled to presumed damages as the natural and probable consequences of the per se defamation. *Elliott v. Roach*, 409 N.E.2d 661, 683 (Ind.Ct.App.1980). The law presumes that the plaintiff's reputation has been

---

**6.** *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**7.** *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

**8.** *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

**9.** *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952).

damaged, and the judge may award a substantial sum for this presumed harm, even without proof of actual harm. *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 684, 321 N.E.2d 580, 589 (1974), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). In short, defamation per se is a statement defamatory on its face, and does not require proof of special damages.

All other factual communications, even if they are defamatory in that they tend to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from associating or dealing with the person, are generally considered defamation per quod. *Rambo*, 587 N.E.2d at 146. Defamation per quod is actionable only if it causes the plaintiff special damages. *Jacobs v. City of Columbus*, 454 N.E.2d 1253, 1264 (Ind. Ct.App.1983), *trans denied*. The Restatement (Second) of Torts provides that "[o]ne who publishes a slander that, although not actionable per se, is the legal cause of special harm to the person defamed, is subject to liability to him." Restatement (Second) of Torts § 575 (1977). Essentially, special damages are pecuniary loss. *See generally Rambo*, 587 N.E.2d at 146. Because the phrase "camel jockey" and the word "Arab" do not fit within any of the categories of defamation per se, I agree with the majority that the plaintiff is only left with a defamation per quod cause of action.

The threshold inquiry in every defamation action is whether the statement, word, or phrase at issue is capable of a defamatory meaning. The Restatement (Second) of Torts provides that "[t]he meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." Restatement (Second) of Torts § 563 (1977). Typically, the trial court utilizes a two-step process to determine whether a communication has a defamatory meaning. First, the court interprets the communication uttered or written by the defendant to determine its meaning. This "linguistic analysis" of the defendant's statement largely involves an examination of the communication itself and the context and circumstances surrounding the speech. Second, the court must determine whether the communication is of the type that harms an individual's reputation, and thus, is defamatory. Under this step, the court must look to societal and cultural attitudes, beliefs, and prejudices to determine whether the communication is unprotected speech because it has a tendency to harm an individual's reputation.

We have defined defamation as communication or speech which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff. *Kitco*, 706 N.E.2d at 587. The Restatement (Second) of Torts defines a defamatory statement as one that "harm[s] the reputation of another so as to lower him in the estimation of the community or ... deter[s] third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). To qualify as a defamatory communication, the communication need not " ... prejudice the person in the eyes of everyone in the community or of all one's associates, nor even in the eyes of a majority of them. It is enough that the communication would tend to prejudice one in the eyes of a substantial and respectable majority of that group...." Restatement (Second) of Torts § 559 cmt. e (1977). The gravamen of a defamation action is harm to the plaintiff's reputation in the eyes of others. *Rambo*, 587 N.E.2d at 146. Thus, in simplest terms, a defamatory statement is one that harms an individual's reputation in the eyes of the community.

Speech is the primary means by which human beings communicate ideas and beliefs. Therefore, it is clearly evident that speech may influence an individual's ideas, beliefs, and attitudes. Speech also is one of the easiest methods an individual can utilize to injure a person's reputation and

good name, requiring no more than a few spoken words by the defamer to others. Furthermore, speech is the primary means by which individuals identify others. For example, if I tell others that Jill is a Protestant, I am identifying her with a religion. But racial slurs and epithets provide no means of identifying others; the verbal insults only provide a means of stereotyping and dehumanizing victims of the verbal insults. Racial slurs are ad hominem to an individual, and have no place in a civilized society.

Some categorize racial slurs as political speech, and thus protected. However, I wholeheartedly oppose such categorization. I cannot envision anything about racial defamation that would justify its participation in the "marketplace of ideas." Racial slurs and epithets accomplish nothing except to dehumanize others solely upon the basis of their race. Moreover, racial insults stigmatize victims by race and perpetuate racial prejudice in society. The phrase "camel jockey" is clearly a racial slur, and has no other purpose than to demean and lower a person before others. I believe that phrase in and of itself has a defamatory meaning, and thus, constitutes defamation per quod if the plaintiff can prove special damages.

This is especially true when one examines racial slurs as they relate to the primary defense to defamation, truth. We have held that true statements never give rise to liability for defamation. *Conwell v. Beatty*, 667 N.E.2d 768, 774 (Ind.Ct.App. 1996). The truth defense to defamation is derived from Article I, Section 10 of the Indiana Constitution which provides that "[i]n all prosecutions for libel, the truth of the matters alleged to be libelous, may be given in justification." It is generally rec-

ognized that a defendant who asserts the defense of truth in a slander action is not required to justify every word of the alleged defamatory matter; it is sufficient if the substance of the matter is true. *See* Restatement (Second) of Torts § 581 cmt. b (1977). If, for example, I called John Smith a murderer, the trial court must examine the evidence to determine whether or not the statement is true. If the evidence shows John is in fact a murderer, then John's defamation action is defeated. However, truth has no relevance when examining a racial slur because the substance of a racial slur is never true.[10] Thus, the racial slur "camel jockey" is defamatory in and of itself, and thus, constitutes defamation per quod if the plaintiff can prove special damages. This comports with Article I, Section 12 of the Indiana Constitution which provides in pertinent part that "[a]ll courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law...."

However, the word "Arab" is more troubling. Standing alone, the word "Arab" generally refers to a person whose ethnic origin is from the Middle East or North African regions of the world.[11] However, I believe that the word "Arab" can also have a defamatory meaning, and thus, be actionable as defamation per quod if special damages are proven by the plaintiff. This court has held that some communications are susceptible to either a defamatory or a non-defamatory interpretation. *Rambo*, 587 N.E.2d at 140. Words not actionable in themselves may be actionable by their allusion to some extrinsic fact, or by being used and understood in a different sense from their natural meaning. *McQueen v. Fayette County Sch. Corp.*, 711 N.E.2d 62,

---

10. I disagree with the cases cited in *Rambo* that racial slurs and epithets cannot constitute defamatory per quod, because I believe that the true/false distinction has no applicability to verbal insults, unlike other defamatory communication.

11. Arab is defined as " ... [a]ny of a Semitic people originally from Arabia, but later widely scattered throughout the Near East, North Africa, and the Arabian Peninsula. Loosely, any of a nomadic people living in North African and Near Eastern desert regions." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 66 (1981).

65 (Ind.App.1999). Moreover, we have held that the determination of whether a communication is defamatory is to be presented to the jury as a question of fact only if the communication is reasonably susceptible to either a defamatory or a non-defamatory interpretation. *Chestnet v. K–Mart Corp.*, 529 N.E.2d 131, 135 (Ind. Ct.App.1988), *trans. dismissed.*

Furthermore, I believe that defamation is a "recipient-based tort" in that it focuses on the views and opinions of others and their response to the defamatory statement. Because the climate of opinion changes according to the time and place of publication, the circumstances surrounding the communication are important in determining whether the speech is defamatory. For example, if I referred to another as a "Tory" and published the statement to a third party in the Thirteen Colonies during the American Revolution, it would surely be defamation if false. However, if I made the same false statement about someone and published it to a third person in America in the present day, it clearly would not injure the person's reputation in the community, and thus, would not constitute defamation. Therefore, I believe that it is a question of fact whether the NIPSCO Supervisor's reference to Dabagia as an "Arab" had a defamatory meaning, and thus, it was within the province of the jury looking to the context and surrounding circumstances to determine the meaning of the word when spoken.

Finally, I believe that the relationship between the defamer and the victim of the racial defamation is relevant in determining whether communication has a defamatory meaning. The defamer, the NIPSCO supervisor, retained a superior position over the victim of the racial defamation, Dabagia, because she was Dabagia's boss. The defamer's status as a NIPSCO supervisor effectively rendered his disparaging remarks about Dabagia more injurious to Dabagia's reputation in the community than if the defamer was a subordinate employee of the company. Dabagia could not respond to the defamer's verbal insults for fear of losing his job or being disciplined.

Although I believe that the phrase "camel jockey" has a defamatory meaning, and that the word "Arab" is susceptible to two different meanings, I agree with the holding of the majority because Dabagia has not proven special damages. Dabagia has not proven that he has suffered pecuniary loss as a result of the defamatory communication, and thus, this court may not allow recovery under defamation per quod. He has failed to prove that the communication was the proximate cause of his lost wages and medical bills. Because Dabagia has failed to prove special damages, no action for defamation per quod may lie.